McFADIN v. CATRON *et al.*, *Appellants*.

Division Two, February 2, 1897.

1. **Practice**: WILL: PEREMPTORY INSTRUCTION. When there is no evidence to support the issue the court may give a peremptory instruction in a will contest as well as in any other case. *Maddox v. Maddox*, 114 Mo. 35.

2. ———: ———: PRESUMPTION: BURDEN OF PROOF. When the formal execution of a will according to the requirements of the statutes is shown beyond a peradventure, and the subscribing witnesses testify as to the proper age and sanity of the testator, a will *prima facie* valid is established, and it then rests upon the contestant to overcome this presumption by substantial evidence of incapacity, fraud or undue influence.

3. **Will**: INCAPACITY OF TESTATOR: EVIDENCE. The mere statement that a mind is weaker at one time than it was at another, imparts no information of the capacity of the person to make a will at the time of its execution. The fact that the testator grew more feeble in mind and body in her old age, did not alone incapacitate her for making a will, even though she was over eighty years old when her will was made.

4. **Will**: UNDUE INFLUENCE DEFINED: EVIDENCE. Undue influence on the action of the testator in making a will, is not the influence of affection and attachment; it is not the mere desire of gratifying the wishes of another, for that would be a strong ground in support of a testamentary act; there must be proof that the act was obtained by coercion, by importunity that could not be resisted; that it was done for the sake of peace, so that the motive was tantamount to force or fear. The influence denounced by the law must be such as amounts to over-persuasion, coercion or force, destroying the free agency or will power of the testator. *Jackson v. Hardin*, 83 Mo. 185.

5. **Will**: UNDUE INFLUENCE: EVIDENCE: PRESUMPTION. The existence of the motive and opportunity for undue influence will not, in the absence of affirmative evidence of its exercise, warrant the presumption of such influence in a case where testator's mind is unimpaired and where she had an opportunity to and did understand the provisions of the will.

6. **Will**: EVIDENCE: DISCRIMINATION AMONG CHILDREN. Inequality of gifts, and partiality of the testator for a certain child, are not sufficient grounds for setting aside a will, even though the testator gives nearly all of a very large estate to such legatee.

In Court in Banc, March 16, 1897.

1. **Appellate Practice**: MOTION TO TRANSFER TO COURT IN BANC. The court *in banc* refuses to transfer a cause from one of the divisions to the Supreme Court *in banc*, in the circumstances stated in the opinion.

2. ——: ——. Motions filed subsequently to a judgment in a cause are matters pertaining thereto and must be filed in the division of the Supreme Court which rendered the judgment. *State v. Duestrow*, 136 Mo. 44, followed.

*Appeal from Saline Circuit Court.*—HON. RICHARD FIELD, Judge.

REVERSED.

*John E. Burden* and *Boyd & Murrell* for appellants.

(1) The court erred in permitting plaintiff to prove a contract of testatrix with negro Hall to leave him a home. The Supreme Court had determined this question improper. *McFadin v. Catron*, 120 Mo. 266. (2) In offering testimony as to altercation between plaintiff and defendant James H. Catron when they were children. (3) The trial court committed error to the prejudice of defendant in refusing to admonish the attorney for plaintiff for introducing the prejudicial questions and offers of proof above mentioned. (4) Incompetent evidence, although subsequently withdrawn by instructions, will work a reversal in cases where the evidence is of such a character and the whole case so presented as to induce the belief that the jury may have been influenced by its erroneous admission. *Dillingham v. Russell*, 15 Am. St. Rep. 753. (5) When the verdict is the result of prejudice, it will be set aside. *Winkley v. Foye*, 66 Am. Dec. 715, and notes page 718; *Spohn v. Mo. Pac. R. R.*, 87 Mo. 74; *Gar-*

*rett v. Greenwell*, 92 Mo. 125; *Whitsett v. Ransom*, 79 Mo. 258; *Walton v. K. C. R. R.*, 49 Mo. App. 620; *Flanders v. Green*, 50 Mo. App. 371. (6) The rule that the proof of contradictory statements goes to the credibility of the witness does not extend so far as to introduce previous expressed opinions of the witnesses. 1 Thompson on Trials, sec. 493; *McFadin v. Catron*, 120 Mo. 264; *Harper v. St. Louis R. R.*, 47 Mo. 567, 581; *Boatman's Savings Bank v. Overall*, 16 Mo. App. 510; *Coble v. McDaniel*, 33 Mo. 363; *Dunn v. Altman*, 50 Mo. App. 231, 238; *Holmes v. Anderson*, 18 Barb. 420; *Comm. v. Mooney*, 110 Mass. 99. (7) The trial court erred in admitting in evidence the declarations of Martha Catron as to the intention and wishes of Minitree Catron, her husband, and that she held the property in trust for the benefit of her children and intended to carry out her husband's wishes. *Rule v. Maupin*, 84 Mo. 587. This proceeding is to contest the paper propounded as Martha Catron's will and not the will of Minitree Catron. The evidence must correspond with the allegations and be confined to the issue. 1 Greenleaf Ev., sec. 51; *Champlin v. Champlin*, 136 Ill. 309. (8) The trial court erred in admitting over defendant's objections the following testimony: The statement of defendant made during the late war "that his mother would marry again and he would never get any of her property;" that defendant said in 1854 that he was going to separate his sister from her husband and had succeeded; that defendant, Henry Catron, carried the keys by order of his mother on her deathbed; opinion as to defendant, Henry Catron, having charge of the keys to the bureau drawer; statement as to the wealth of defendant, which he had accumulated by his own thrift; conclusion and opinion of Tom Catron that defendant "assumed" control of administering medicines; that defendant did not visit his sister, but hated

her; that plaintiff was guilty of no unkindness or discourtesy to her brother, submitting to the jury the personal relation of plaintiff and defendant; testimony about obituary notice said to be written by defendant; testimony that several months after the will was made Henry Catron threatened to commit suicide if his mother did not consent for Tom Catron to come there and reside and wait upon her; evidence that defendant in the last sickness of his mother, ten months after the will was executed, put alcohol, stupefying medicine, on his mother's head; declarations of defendant eight months after the will was executed concerning the nursing and care of his mother; question as to why defendant moved to Ray county in 1865; statement in presence of jury as to inscription on tombstone of testatrix; that defendant did not ask his sister to wait on the testatrix in her last sickness, and was afraid that plaintiff would poison her mother; statement that defendant only visited his mother once a year; declaration of testatrix made after the will had been executed some eight months "that Henry is here after my money;" "when I am gone you will see;" that testatrix did not want defendant to come to her home in her last sickness; that plaintiff was willing for him to come but testatrix reproved her for it; declaration of testatrix "not to trust Henry and Terhune but to trust Tom Catron;" evidence as to a proposed compromise for peace and friendship between the parties; question to defendant as to any acts of unkindness by his sister, the plaintiff, and their personal relations. (9) "The acts must be connected with the will and shown to have produced it." *Tingley v. Cowgill*, 48 Mo. 297; *Ketchum v. Stearns*, 8 Mo. App. 69, 70; affirmed in 76 Mo. 396. (10) These declarations were too remote and did not tend to prove the state of the mind of testatrix at the time of the execution of the will, and could not be

used to prove the truth of the facts contained in the declarations and were not admissible on the question of undue influence. *Gibson v. Gibson*, 24 Mo. 227; *Spoonemore v. Cables*, 66 Mo. 579; *Rule v. Maupin*, 84 Mo. 587; *Boylan v. Meeker*, 4 Dutch. 274; *Kitchell v. Beach*, 35 N. J. Eq. 446. (11) The trial court committed error in admitting the hypothetical question to be propounded to the expert witnesses, Drs. Whitten and Alexander, and the answers to the same, there being no facts in the case to justify the opinion of medical experts. The opinions of the witnesses that the mind of the testatrix was failing amounts to nothing, as a mind may be in a failing condition and yet possess testamentary capacity. The opinions of other witnesses that she was weak-minded or childish are based on no facts and consequently worthless. The hypothetical question must embrace facts in evidence. *Rankin v. Rankin*, 61 Mo. 301; *Stackhouse v. Horton*, 15 N. J. Eq. 228; *Kerr v. Lunsford*, 8 S. E. Rep. 493, and notes; *Russ v. Railroad*, 112 Mo. 45. The trial court committed error in admitting in evidence the testimony of plaintiff as to why she sold the Carroll county lands. One reason assigned by the testatrix why she did not devise the plaintiff land is, that she sold the Carroll county land which her father had given her. "The question as to whether the testatrix's reason or motive for making her will as she did, whether they are good or judicious, is immaterial and can not be investigated." *Stackhouse v. Horton*, 15 N. J. Eq. 227; *In re will of John Gluspin*, 26 N. J. Eq. 529. (12) The trial court committed error in admitting the evidence and impeaching questions to witness, after the defendant had finally closed. *Rankin v. Rankin*, 61 Mo. 299. (13) Evidence of statements made by a witness out of court, when received to impeach his contrary testimony in court, can not be treated as

independent evidence, that is, as competent evidence of the truth of the statements thus made. 1 Thompson on Trials, sec. 492; *McFadin v. Catron*, 120 Mo. 252; *Shoninger v. Day*, 53 Mo. App. 148; *Harper v. R. R.*, 47 Mo. 567; *Bank v. Murdock*, 62 Mo. 70. (14) This question of testatrix's testamentary capacity ought not to have been submitted to the jury. There is no evidence of a want of testamentary capacity. The evidence is all the other way. A testator who understands the business about which he is engaged when he executes his will, the persons who were the natural objects of his bounty, and the manner in which he desires the dispositions to take effect, is capable of making a will. He need not be able to make a contract or to manage his estate. *Brinkman v. Rueggesick*, 71 Mo. 553; *Couch v. Gentry*, 113 Mo. 248; *Jackson v. Hardin*, 83 Mo. 175. (15) There is no evidence in this case to justify the trial court in submitting the issue of undue influence to the jury. Undue influence is that which compels a testator to do that which is against his will, through fear, through the desire of peace, or through the exercise of some coercive power which he is unable to resist, and but for the exercise of which the will would not have been made as it was. It is not sufficient that the undue influence exists to invalidate a will; it must be exerted and exercised over the mind of the testator at the time of the testamentary act. Undue influence amounts to nothing unless the will is made contrary to the intention of the testator. *Sunderland v. Hood*, 84 Mo. 293; *Ketchum v. Stearns*, 8 Mo. App. 70. (16) Opportunity and interest are not facts from which undue influence can be presumed. *Kitchell v. Beach*, 35 N. J. Eq. 454; *Boylan v. Meeker*, 4 Dutch, 288; *Turnure v. Turnure*, 35 N. J. Eq. 437. (17) Undue influence is not a presumption, but a conclusion. *Kise v. Heath*, 33 N. J. Eq. 244; Lawson's

Presump. Ev. 569.   (18) The will having been exe-
cuted with due formality, the testatrix having been at
the time of competent understanding, the burden of
the proof of undue influence is on the contestant.
*Maddox v. Maddox;* 114 Mo. 35; *Wheeler v. Whipple,*
44 N. J. Eq. 141; *Jones v. Roberts,* 37 Mo. App. 163.
(19) In determining whether a will is procured by
undue influence, it is proper to see if the dispositions
are in harmony with testator's intentions and affec-
tions.   *Allen v. Pub. Adm'r,* 1 Bradford, 378; *In re
Hess's Will,* 31 Am. St. Rep. 665–670; *In re Gideon
Humphrey Will,* 26 N. J. Eq. 513; *Collins v. Osburn,*
34 N. J. Eq. 521.   (20) The second instruction for
plaintiff is prejudicial in that it assumes that these
were persons "dependent" on her bounty, calling the
attention of the jury by the word "dependent" to the
plaintiff as the mother of ten children, and as owning
only a small estate.   (21) The instruction declares that
the burden of proof of testamentary capacity remains
with the defendant during the entire trial.

This court has said: "The law presumes that the
testator was possessed of a sound and disposing mind.
And after the statements made by the attesting wit-
nesses, the burden of proof rested on the contestants
to overcome this presumption by persuasive evidence."
*Jackson v. Hardin,* 83 Mo. 182.   (22) Instruction 3
erroneously submits the question of undue influence
when there is no evidence in this record on which to
base the instruction.   The instruction is ambiguous
and confusing in submitting both issues of testamen-
tary capacity and undue influence; bids the jury con-
sider a mass of facts, some of which bear on one of the
issues only, and some bearing on neither; is vicious in
that it selects particular facts and commends the jury to
consider them; such as "her affections for those who,
but for the will, would be her heirs at law, the financial

condition in life of both her son and daughter, their acts and conduct," etc. "Financial conditions" have no tendency to prove undue influence, nor can testamentary capacity be determined by the "acts and conduct" of other persons than the testator. *Mays v. Mays*, 114 Mo. 536; *Grimm v. Tittman*, 113 Mo. 57–66. There is no evidence in this record that James Henry Catron "by fraud, deception, or importunities, persuaded, induced, or procured his mother to execute the paper." (23) The jury are told that if Henry Catron had "an influence." This is misleading. Catron may have had "an influence," acquired by his love and devotion to his mother not obnoxious to the law. He might have exercised that influence by modest importunities or persuasion and thereby procured the will legitimately and lawfully, and still it would have been Martha Catron's will. In the absence of undue influence exercised in procuring the paper, the favorite devisee is not required to explain provisions of the will. *Kendig v. R. R.*, 79 Mo. 207; *Judd v. R. R.*, 23 Mo. App. 56; *McFadin v. Catron*, 120 Mo. 274; *Young v. Ridenbaugh*, 67 Mo. 586. (24) The substance of the instruction is, that if there is inequality in the will, and Catron had an undue influence, without exercising it to procure the will, then the burden is on him to explain. (25) It is not the existence, but the exercise of an improper influence in the very act of making the will, which invalidates it." *Richmond's Appeal*, 21 Am. St. Rep. 99; *Knox v. Knox*, 95 Ala. 495; *Sunderland v. Hood*, 84 Mo. 293; *Carl v. Gabel*, 120 Mo. 283. (26) The trial court committed error in refusing to give the instruction asked by the defendant, directing the jury to find the issue submitted for the proponant. The evidence shows testamentary capacity. (27) Instruction number 18 should have been given. The facts showed that the testatrix

delivered the will at the execution thereof to James
F. Catron, who resided within three miles of her, was
frequently at her house and from whom she could
have obtained the will at any time; that she lived ten
months after executing the will.  *Floyd v. Floyd*, 3
Strobhart, 44; 49 Am. Dec. 626, 633;  *Shailer v. Bum-
stead*, 99 Mass. 125; 1 Redfield Wills, 514, 515, note
15; *Spoonmore v. Cables*, 66 Mo. 587, 588; 1 Jarmine
Wills, 142 American Notes by Randolf & Talcott;
*Gibson v. Gibson*, 24 Mo. 233.  (28) The last will
being the counterpart of the will made in May, 1867,
the testatrix had about twenty-four years for delibera-
tion.   There is no evidence in this case to support the
verdict of the jury.   And we ask that this case be
reversed, but not remanded, and that such judgment as
should have been rendered by the lower court, be now
rendered here.   R. S. 1889, sec. 2304; *Jackson v.
Hardin*, 83 Mo. 187; *Sunderland v. Hood*, 84 Mo. 293;
*Carroll v. Int. St. R. T. Co.*, 107 Mo. 654; *Couch v.
Gentry*, 113 Mo. 256, 257.

*J. D. Shewalter, Wallace & Chiles*, and *Samuel
Davis* for respondent.

(1)   A sound and disposing mind and memory is
the ability to know that the party is disposing of his
property by will, the general nature and character of
the property, what disposition is being made thereof,
to recall those dependent on his bounty and to dispose
of the same with understanding.  *Brinkman v. Rueg-
gesick*, 71 Mo. 556; *Young v. Ridenbaugh*, 67 Mo. 574;
*Jackson v. Hardin*, 83 Mo. 175; *Thompson v. Ish*, 99
Mo. 160.   (2)   Undue influence is acts or conduct
which force or control the will of a person executing a
paper, and causes them to execute it, not according to
their own, but another's desires.   In other words, it is

the control of free agency. *Jackson v. Hardin*, 83 Mo. 175; *Sunderland v. Hood*, 84 Mo. 293; *Rankin v. Rankin*, 61 Mo. 295; *Brinkman v. Rueggesick*, 71 Mo. 553. (3) The court instructed the jury that inequality alone, if it existed, would not avoid the will or shift the burden to defendant; but if defendant had and exercised any undue influence, and neither the paper nor the evidence explains the cause of such inequality, then it rests upon the defendant to explain the provisions of the said will. (4) The court further told the jury that old age, sickness, mere weakness of mind or inability to make a contract did not incapacitate the making of a will, and if of sound mind and not procured by undue influence, the reasonableness or unreasonableness, justice or injustice of its provisions could not avoid it. And deceased had the absolute right to dispose of her property as she pleased even to the exclusion of one child. (5) The burden of proof on the issue of testamentary capacity, or soundness of mind, is on the defendant and remains with him during the whole trial, hence there was no error in instruction number 2 given for plaintiff. *Norton v. Paxton*, 110 Mo. 456; *Maddox v. Maddox*, 114 Mo. 35. (6) The instructions in this case on the part of the plaintiff are the same that were approved by this court on the former appeal. (7) On the instructions the only remaining question is: Was there any evidence tending to prove the issues of undue influence and unsoundness of mind? *Reid v. Life Ins. Co.*, 58 Mo. 421; *Bank v. Armstrong*, 92 Mo. 265; *Bank v. Wood*, 124 Mo. 72. (8) For where there is any evidence, and the law has been declared with substantial accuracy, this court will not interfere. *McClintock v. Curd*, 32 Mo. 422; *Muller v. Hospital Ass.*, 73 Mo. 242; s. c., 5 Mo. App. 390. (9) No case has been cited, and we take it none has ever been decided, where the mere asking of questions

is held to be error. (10) No error was committed in admitting evidence. Plaintiff's contention was that the will was procured by fraud and undue influence. And as a part thereof, his studied insults and hatred of his sister, and his attempts to prejudice his mother against her were competent. They were communicated to the testatrix, for plaintiff says deceased told her not to visit her when Henry was there, and upon one occasion when she heard that he was coming, deceased came to plaintiff's house and notified her. (11) The declarations of Martha Catron both before and after the execution of the will were competent, upon the condition of her mind and the state of her affections. They were not declarations of her husband's, but hers. *Rule v. Maupin*, 84 Mo. 587; *Thompson v. Ish*, 99 Mo. 160. (12) This evidence was not offered for the purpose of showing any trust, but for the simple purpose of showing the declarations of Mrs. Catron tending to show the state of her affections and the condition of her mind at the time they were made. (13) There was no error in admitting evidence of the rental value of the land and the settlements of Minitree Catron's estate. This court, in the former decision, laid stress upon the accumulation of money by Mrs. Catron, as bearing upon the condition of her mind. It was competent, in this view, or any view, for plaintiff to show she had received $8,000 from her husband's estate; that this was kept on deposit in bank at four or five per cent interest, which would more than account for her accumulations. All evidence which puts the jury in the place of the testator, and any facts which will enable them to receive any light upon the mental condition of the party, is competent. (14) All evidence showing the condition of mind, relation of parties, their acts, conduct and deportment is competent. Did defendant force or coerce deceased or procure the will

by undue influence? On this question his acts watching and guarding her after the will, are competent. *McFadin v. Catron*, 120 Mo. 252. (15) When the facts are conflicting it is competent to put hypothetical questions to experts. 1 Green. Ev. [4 Ed.], sec. 440, p. 550; *State v. Baber*, 74 Mo. 292-7. In this case there was evidence tending to prove all the facts stated in the questions to Dr. Whitten (defendant's family physician) and Dr. Alexander. (16) On the question of the sale of the Carroll county land, the evidence of the circumstances were competent for two reasons. Did deceased object to the sale? Plaintiff insists that she did not; or, if she did object, were the circumstances such as to show the objections were from a disordered mind? Testatrix, if of sound mind, could disinherit her daughter for good reasons, or for no reasons at all. Yet, if she gave reasons, these very reasons may furnish the most convincing evidence of unsoundness of mind. *Benoist v. Marvin*, 58 Mo. 307. (17) If there is any evidence upon the issues, this court can not interfere; it is for the jury. Appellant labors to show the court that the weight of evidence is in favor of the will. That question is submitted to another tribunal. *Muller v. St. Louis Hospital*, 5 Mo. App. 397 and 399. (18) After two findings for the plaintiff, this court will not disturb the finding of the jury on a question of facts. R. S. 1889, sec. 2241; *McShane v. Sanderson*, 108 Mo. 316; *O'Neil v. Young*, 58 Mo. App. 628; *Nicol v. Hyre*, 58 Mo. App. 134.

GANTT, P. J.—This is the second appeal in this case. The decision in the first is reported in 120 Mo. 252.

This, like the former, is an appeal from the judgment of the circuit court of Saline county whereby the probated will of Mrs. Martha Catron was set aside and held for naught.

The very correct summary of the evidence on the former appeal by Judge BURGESS comprehends the principal facts on the present appeal, but these have been somewhat modified and supplemented on the last trial and these changes will be noted.

The learned counsel have drawn such radically different conclusions from the facts in the record that it has entailed much labor to verify the different statements.

Appellant's abstract alone contains nearly a thousand pages, and respondent's counter-abstract one hundred and sixty pages. As the contention upon the one hand was, there was no evidence to sustain either of the issues, to wit, want of testamentary capacity, and second, that the will was procured by fraud and undue influence of the appellant, James H. Catron; and, on the other, that there was ample evidence to sustain both, recourse was necessarily had to the evidence at large, and such an undertaking with the many interruptions incident to calls of the docket, and the hearing of extraordinary writs and criminal causes, has necessarily caused an unusual delay in our judgment.

Upon the former appeal, we held upon the case made that the circuit court erroneously submitted the question of the testamentary capacity of Mrs. Catron to the jury, for the reason that notwithstanding her age and physical infirmities the evidence was overwhelming, not only by the subscribing witnesses but from all the testimony read together, that she had sufficient understanding to know she was disposing of her property by will, the nature and extent of her property, the persons who were the natural objects of her bounty and the manner in which she desired the dispositions to take effect.

She had but two children and she provided for both in her will. Her estate, while considerable, was not

VOL. 138 mo—14

complicated. She owned two farms not far apart and had her money in bonds and loaned out on notes. The instrument was drawn ten months before Mrs. Catron's death. There appears not to have been the slightest secrecy about the fact that she was making her will on that day. Her granddaughter, Eva McFadin, a daughter of plaintiff, was visiting her that day and rode home with Mr. George Catron who drew the will. The defendant, the principal devisee and legatee, was absent at his home in Nebraska City, two hundred miles distant. She did not call strangers to assist her in its preparation, but George Catron, a cousin of plaintiff and defendant. She also requested James F. Catron, another nephew of her deceased husband, to act as a witness. George Catron testifies that he had known the testatrix all his life; that he went to her home from Lexington at her request; that when he reached there he found Lock Terhune, her business manager, and James F. Catron in the room with her; that soon after he came they withdrew leaving him alone with her; that she said she had sent for him to draw her will and thereupon gave him *full instructions* as to its provisions.

She said: "I will begin with Evaline [plaintiff] first." She wanted her to have $5,000 placed in the hands of a trustee to manage for her, so she could not spend it. She asked George Catron to act as trustee and when he suggested that possibly he could not act for some reason, she named W. J. Catron, and in case of his inability to act, Thomas Catron. She then stated she wanted her son Henry, the defendant, to have all the balance of her property. She was quite positive in her statements that she did not want either the McFadins or Ewings to have her property or control it. Defendant's wife was a Ewing. George Catron says

he then wrote the will, and read it over to her, and she said "it was exactly what she wanted."

Twenty-three years prior to this she had executed another will by which she gave Mrs. McFadin, the plaintiff, $4,000 to her separate use, free from the debts of her husband. All the balance of her estate she gave to the defendant, her real estate to him for his life, remainder to his children. In that will her son was appointed sole executor. Messrs. George A. Rathbun and Amos Green, members of the bar at Lexington, were the subscribing witnesses. Col. Rathbun testified that Mrs. Catron dictated the old will; that it was read over to her, and she signed it. All the evidence tends to show that at that time Mrs. Catron was a woman of strong mind and of unusual will power.

Jas. F. Catron testifies further that when Mrs. Catron said to him she thought of making her will, he said to her "I thought you had a will." She said she did make one twenty years ago, but that she understood Mr. Rathbun, one of the witnesses, had moved away, and Mr. Green, the other witness, was reported to be dead, and that her son was the sole executor, and some question might be raised as to his eligibility, as he was a non-resident of this State; that if he could not act the McFadins would probably become her executors, and she did not want them to have anything to do with her estate.

It was also clearly shown by the testimony of Messrs. Thomas Catron and Sam Houston that she had consulted each of them as to how she could devise property to plaintiff so as to keep plaintiff's husband from disposing of it, and she was told by Thomas Catron it could be effected by the intervention of a trustee. She gave as a reason that her husband, Minitree Catron, the father of plaintiff, Mrs. McFadin, had given

her a farm in Carroll county and her husband had disposed of it.

George Catron further testifies that after he had prepared the will in contest she discussed with him who should be the subscribing witnesses. She had nominated and appointed Thomas A. Catron and James F. Catron to be executors of her will, and she inquired whether the fact that James F. was named as executor would disqualify him as a witness; she thought he might not be competent. At her request then James F. Catron, Mary Terhune and Lock Terhune were invited into her room and she said to them she had had her will written, and taking it up from the table, she said: "This is my will." "I have sent for you to witness me sign it, and to sign it as witnesses." She then signed it in their presence, and they in her presence and the presence of each other, signed it as witnesses.

These circumstances indicate how clear the mind and memory of Mrs. Catron was. She recalled distinctly the execution of a former will, which she had not seen for twenty years; the names of the subscribing witnesses; fears that Green's death and Col. Rathbun's removal might cause that old will to fail for want of proof; she remembers that her son is her sole executor in that will and being a non-resident might be incompetent to act, and hence she determines to execute a new will. When she comes to dictate the new will she evinces no less clearness of mind and certainty of purpose. All of these witnesses testify that she was a woman of fine judgment, good business capacity and extraordinary firmness.

We have searched in vain for any evidence of a desire upon her part to revoke or retract it. Notwithstanding her age and suffering from rheumatism and cancer we discover nothing in all this voluminous

record which would justify a court or jury in saying that this rather remarkable old lady had not testamentary capacity when she executed the paper writing in contest as her will.   We are of the same opinion as on the former appeal that no such issue should have been tendered to the jury.

We think the court should have instructed the jury that there was no evidence before them to justify a verdict that at the time Mrs. Catron executed the will in contest she did not have sufficient capacity to make the same.   This we consider the established practice in this State.   *Jackson v. Hardin*, 83 Mo. 175; *Maddox v. Maddox*, 114 Mo. 35; *McFadin v. Catron*, 120 Mo. 252.

When the formal execution of a will according to the requisites of the statute, is shown, as it was in this case, beyond a peradventure, and the subscribing witnesses testify to the proper age and sanity of the testator, a will *prima facie* valid is established and it then rests upon the contestant to overcome this presumption by substantial evidence.   *Carl v. Gabel*, 120 Mo. 283.

How was this burden overcome?   The earnestness of counsel demands that we enter upon a somewhat minute examination of the evidence which they claim successfully established a *prima facie* case of incapacity.

A. T. Catron, a nephew of Mrs. Catron, testified that in 1873 his father desired him to go to school in Lexington and he asked Mrs. Catron what she would charge him for board and she told him to see Terhune; that she had promised him not to do anything without consulting him.   When he became importunate and insisted on her telling him her price, she was very firm in refusing to do so, and he left.   Terhune was under contract to furnish half of the supplies and was at that time entitled to one half of the house.

Mr. Thomas A. Catron, one of her executors, testified. He was a nephew of her husband and she had taken him when a babe of three months and kept him until he was nine years old. He had exceptional opportunities of knowing Mrs. Catron. He had been collector of revenue of Lafayette county and had removed from his farm to Lexington. He saw his aunt, the testatrix, as often as once a week. He had borrowed money from her and they maintained the most affectionate relations with each other. Mr. Catron was a witness on the former trial also. His evidence contains much as to the unhappy estrangement of defendant from Mrs. McFadin, his sister, but on the question as to Mrs. Catron's capacity it is readily summed up.

He admitted that he testified on the former trial that he had transacted business with Mrs. Catron in August, 1890, several months after the will was executed, and was asked what was the state of her mind then and had answered *"I think it was good."* He had never questioned her sanity. He testified also that during the last year of Mrs. Catron's life "she grew feebler bodily." "I would judge her mind was not as strong as it was in early life." "I considered she had a failing mind." "I don't think her mind was as strong as in previous years." He further testifies that on one occasion he was at her home and she told him that Terhune had fed six or seven cows on their common lot of corn, and she asked Terhune if he did not pay extra for his extra cows, and he said no. She appealed to the witness to know if Terhune had acted fairly, and he told her he had not, and she subsequently refused to pay Terhune the half of some other expense until he settled for the cow feed.

He testified she had rheumatism and the cancer from which she suffered much pain. In another place he says: "I think when she was in good health she

was a woman of good judgment, fair judgment." "In the last month or two of her life I was at her house for a week at a time." Saw her in June before her death the succeeding March, "her health in mind and body" at that time, compared to her condition two or three years prior thereto "was weaker and frailer." "Her mind was not as vigorous as it had been before." Her memory was not so good. She was more childish as one of her age and disease would be; "nothing more than one would expect from her condition, she was up in the eighties in years."

Col. Joseph Davis, then in his seventy-sixth year, testified that he saw Mrs. Catron in 1870 and again in 1885. Asked as to the condition of her mind in 1885, replied: "I can not express it properly in any other way than that her mind seemed to be declining with her body." "I had no conversation with her to bring out anything of the kind; just her general appearance and manner."

Mrs. Fletcher was not examined in chief as to Mrs. Catron's mental capacity but admitted on cross-examination that her conversation was clear and explicit. She supposed she knew what she was talking about. George Gordon saw Mrs. Catron in the spring of 1890. Had not seen her for four or five years. He stopped and took dinner. He talked with Henry Catron and Terhune principally while there. Mrs. Catron was not feeling well. Didn't talk to her much. Her dinner was served in her room. He thought her mind had failed considerably. He thought she was weak in mind and body without stating any single fact which rendered his opinion competent. Houston gave his opinion also that she was weak and childish. He based his opinion on the fact that Mrs. Catron did not seem to remember where *he* lived at that time; that "she told me or the children to go away;" complained

a good deal; seemed to be forgetful. He does remember, however, that on that same occasion Mrs. Catron consulted him as to the disposition of her property. This witness confessed to the morphine habit about the time he was at Mrs. Catron's house.

Wesley Johnson, who was exceedingly deaf, thought Mrs. Catron was childish because she asked him twice in one conversation where he lived and what caused his wife's death. He went to collect a stallion bill and she asked him to wait until Terhune returned, and when Terhune told her it was correct she paid it. He, moreover, attempted at that time to buy her mules, calves, and other property. He stated no fact from which anyone could form the most remote idea of incapacity on her part. The old lady very naturally and modestly declined to discuss a stallion account with him, but referred him to her agent, Mr. Terhune.

Henry Mason, an old negro man who worked for her, testified to her wise oversight over his work.

Minitree McFadin, a son of plaintiff, testified that he had known his grandmother all his life. Her mind he thought was somewhat impaired; was not so strong in the latter part of her life as it had been before. He, however, stated no facts upon which he based his opinion, or drew his comparison. The same must be said of the evidence of Mrs. Evan Young, Mrs. Metcalf, and Mrs. Huston.

They merely state in a word that she was becoming enfeebled in mind with old age, but the mere statement that a mind is weaker at one time than it was at another imparts no information as to the capacity of the person to make a will at the time of its execution. Such indefinite generalities will not suffice. The law exacts something more definite and tangible than such assertions to destroy the presumption of capacity.

On the other hand plaintiff offered checks of Mrs.

Catron on Lexington banks, tending to show she transacted much important business up to January, 1891. She had drawn out $1,150 in 1890 and had a cash balance of $672.89. She continued purchasing time deposit certificates long after her will was made, thus keeping her money at interest all the time.

While Mrs. McFadin testified in a general way that her mother's mind failed rapidly in her last years, she fixes the occasions when she observed this to be when her mother had violent pains and spells of choking. Her own evidence clearly indicates that when not so suffering her mother neither did nor said anything irrational. Not only did plaintiff fail to show such want of capacity in her mother to make a will at the time it was executed by affirmative evidence, but her own witnesses who had opportunities of really judging of Mrs. Catron's capacity, established the contrary. Mr. Robinson, a witness for plaintiff who boarded with her, talked considerably with the old lady and found her exceedingly interesting, intelligent and sound-minded. Mr. B. R. Ireland, a merchant and banker in Lexington, testified she was a woman of good, sound judgment. Never saw anything to the contrary. John Catron, her brother-in-law who had known her since 1833, testified that she was a woman of good common sense and strong mind. She was of a positive, firm character, and disposed to have her own way. She had an opinion of her own and generally held onto it.

But conceding that Mrs. Catron was growing more feeble, both in mind and body, and this is the utmost that can be ascribed to all of this evidence, yet again and again has this court and other courts of last resort determined that these circumstances alone did not disable her from making a will. Her capacity to make her will was clearly established. *Couch v. Gentry*, 113 Mo. 248, and cases cited.

II. But it is further insisted by plaintiff that the will in contest is the result of undue influence exercised over Mrs. Catron by her son James Henry Catron. Is there substantial evidence of such undue influence in this record?

It will be helpful before examining the evidence to ascertain what the law of the land denominates "undue influence."

In Williams on Executors [7 Am. Ed.], p. 58, it is said: "It must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; further, there must be proof that the act was obtained by coercion; by importunity that could not be resisted; that it was done merely for the sake of peace; so that the motive was tantamount to force or fear." In *Boyse v. Rossborough*, 6 House of Lords, 6, the subject of undue influence received full consideration, and Lord Chancellor Cranworth, as the result of that examination and deliberation, said: "In a popular sense we often speak of a person exercising undue influence over another when the influence certainly is not of a nature which would invalidate a will." * * * "In order, therefore, to have something to guide us in our inquiries on this very difficult subject, I am prepared to say that influence, in order to be undue within the meaning of any rule of law which would make it sufficient to vitiate a will, must be an influence exercised either by coercion or by fraud. In the interpretation, indeed, of these words, some latitude must be allowed." It was held by this court in *Jackson v. Hardin*, 83 Mo. 185, that: "The influence denounced by law must be such as amounts to over-persuasion, coercion or force, destroying the free agency and will power of the testator. It must not be merely the influence of affection or at-

tachment, nor the desire of gratifying the wishes of one beloved, respected, and trusted by the testator." *Rankin v. Rankin*, 61 Mo. 295. It is the generally accepted doctrine that the burthen of proving a will is the result of undue influence, is upon the party alleging it. *Carl et al. v. Gabel*, 120 Mo. 283.

Nor have the cases been wanting in which the *quantum* of proof requisite to establish such undue influence has been discussed and determined. Thus, it is held that the *existence of the motive and opportunity* for undue influence will not, in the absence of affirmative evidence of its exercise, warrant the presumption of such undue influence in a case where the testator's mind is unimpaired and where he has an opportunity to, and did, understand the provisions of the will. *Brinkman v. Rueggesick*, 71 Mo. 553; *Sunderland v. Hood*, 84 Mo. 293; *Myers v. Hauger*, 98 Mo. 433; *Cudney v. Cudney*, 68 N. Y. 148; *Bancroft v. Otis*, 91 Ala. 279.

The House of Lords in *Boyse v. Rossborough*, 6 H. of L. Cases, 2, further held that in order to set aside the will of a person of sound mind: "It is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis."

With these tests in view we have endeavored to separate the facts in evidence from a large mass of incompetent and misleading matter improperly injected into the case.

These facts are that Mrs. Catron had but two children, plaintiff a daughter, and defendant a son. Neither of these children lived at home at the time of their father's death. Both were married prior to the decease of their father. It appears that in his lifetime Minitree Catron had given each of his children a tract of land,

and by his will gave Mrs. Catron the remainder of his estate. Soon after her husband's death, Mrs. Catron employed Terhune to manage her farms for her, and he continued to do so until her death. She did not rely upon either of her children in the management of her affairs. Her son, the defendant, went to the State of Nebraska in the year 1865 and had made his home there up to the trial. In the year 1867, as already noted, Mrs. Catron had executed a will giving Mrs. McFadin $4,000 to her separate use. There is no evidence tending in the most remote degree to show that Mrs. Catron's mental or physical strength was impaired when she executed that will and not the slightest evidence that defendant exercised any undue influence over his mother in procuring that will to be drawn as it was.

After defendant went to Nebreska City to live, his custom was to visit his mother once or twice every year. When he was in Missouri on a visit in May, 1867, his mother gave him her will in a sealed envelope which he testifies was not opened until December 31, 1891, after her death and the bringing of this suit. By that will she devised to defendant all her real estate for his life, remainder to his children, and all of her personalty except the $4,000 bequeathed plaintiff.

By the will in contest he is made the residuary legatee and devisee of all her estate, both real and personal, after the payment of the legacy of $5,000 to Mrs. McFadin for her life, and the remainder therein to her children. It will be observed that by the last will plaintiff and her children receive $1,000 more than under the first, and that under neither do they receive any part of the land.

It is difficult to discern a motive on part of defendant to obtain the execution of a new will whereby defendant would receive $1,000 less than under the *first* will. No reason whatever is given why he should

have interfered in behalf of plaintiff's children so as to secure to them the body of the legacy of which plaintiff was to receive the usufruct. Mrs. McFadin testified that her mother gave her money nearly every year; that she had a pride in seeing plaintiff and her children well dressed; that she gave her a buggy horse and that the utmost affection existed between the mother and daughter.

The evidence demonstrates that the defendant had succeeded in amassing a fortune of $100,000 by his own efforts, and that his bearing to his mother was at all times dutiful and affectionate. In 1875 at her solicitation he prepared to come and live with her, but after having repaired the house he decided not to come because his mother wrote him his sister, the plaintiff, objected. His yearly visits to his mother continued until the year 1890. Mrs. Catron had become afflicted with a cancer and on defendant's visit in the spring of that year he determined she ought to have more constant and intelligent care than she could obtain from her negro servants. At this time she was still able to walk about the place. Indeed the evidence shows that she was never confined to her bed until the last two months of her life. The negro house girl was deaf and dumb, and defendant thought his mother ought not to be left at her age with so incompetent a servant. He procured a better servant for her and then returned to his home in Nebraska City. During his absence the will in contest was executed. He returned in about two weeks and remained most of the summer with her.

We have laboriously gone through the charges and counter charges as to the mother's lack of affection for her children, but one fact stands out clear and distinct, that whatever other faults the defendant may have, this record conclusively establishes, by the testi-

mony of the plaintiff's own witnesses, that ingratitude and want of affection for his mother can not be truthfully charged against him. The love and trust that characterized their intercourse and correspondence was creditable to both. Neither needed anything that wealth could command, and yet he constantly sent her small presents, not costly, but they came freighted with a son's love, an incense doubtless, sweeter than all the perfumes of Araby to the old mother. Their correspondence was not spasmodic or occasional, but was continuous all the years. Her letters breathe but one sentiment throughout, that of a mother's pride in, and affection for, her son, and furnish their own internal evidence that the son had responded to her affection. It is worthy of note that the son preserved with scrupulous care all these messages of love from his mother.

The charge that he failed in his duty because he did not remain on her farm after the war and care for her is not founded upon sound reason. Mrs. Catron, with her unusual vigor, really needed no one to manage for her at that time. It must ever redound to the credit of defendant that, instead of becoming a pensioner upon her bounty, he went out into the world and made his own home and fortune. It would be an unnatural father or mother who would not rejoice more in the success of a son, who, unaided, won the respect of the community into which he cast his lot, and attained the enviable position which the defendant is shown to have acquired in Nebraska City, than in one who would calmly sit down and subsist upon the products of a farm won by the energy of his parents.

We doubt not that the success of her son was the sweetest reflection that cheered the life of Mrs. Catron in her old age. Had he been less self-reliant, had he made himself a burden on his mother, or had he made her home his home, all these years, and deprived his

sister of an opportunity to see her mother, some argument might have been built upon his selfishness, but when it is shown that he went to another State, and by his own energy wrought out his fortune, and at the same time maintained cordial and affectionate relations with his mother, it must be said, as to this claim of undutifulness, that it is utterly groundless. But it is said that he came to stay the last months of her life, and that his motive was to compel a will in his favor. His conduct in this respect was natural and normal. Had he failed to come, adverse criticism might be justly made upon his lack of affection, but coming as he did, and performing for her in her last moments upon earth the sweet small offices of affection, cheering her with his constant presence at her bedside, his conduct must receive the commendation of all right-thinking people.

The one great fact upon which the charge of undue influence seems to rest, is, that during the defendant's visit in May, 1890, on one occasion the door of his mother's room was locked or bolted while he was with her. It is assumed that then and there he extorted a promise from his mother that she would make the will in his favor, as she subsequently did; that he then and there wrought upon her fears by threatening to throw himself before a train and commit suicide; that immediately after being locked in the room with his mother the defendant went out to examine some fencing, and that when he returned found his mother greatly excited, that is to say, she was alarmed lest he had gone to commit suicide.

No witness testified to a single fact that occurred in that room on that occasion, except the defendant. His explanation is simple and natural. He says that his mother's house was on the highway to Lexington; that Terhune's children frequently annoyed his mother

by coming into her room and the servants and others often came in and that on this morning his mother desired him to look for a receipt of Dr. Fulkerson for money she claimed to have paid; that she also wished him to get some silver money out of a pouch and put it into a smaller pocket book, and to examine her tax receipts for her. Not wishing to be interrupted he bolted the door, separated the money for her, and made the search and found the receipt for her. He also compared her tax receipts for the ten years past. He testifies without equivocation that the subject of her will was not even mentioned that day. The theory of the plaintiff vanished in face of the positive and uncontradicted evidence of defendant that he did not leave the house the evening he examined the tax receipts, and did not come back and find his mother greatly excited. Neither does the testimony sustain the charge that plaintiff said to his mother at that time he would throw himself under the train if she did not permit him to stay with her. The only expression of this character was made by him long after the will was executed and was an expression of his anguish that his mother should depend upon an old idiotic negro nurse and his unwillingness to leave under such circumstances. The transposition of this evidence while skillful is wholly misleading.

The surmises of plaintiff that influence was exerted on that occasion, unfortunately for her, are baseless so far as evidence was adduced to sustain them. They show only an opportunity and a motive, but that is all. As we have seen, opportunity and motive are not enough. It must be shown that the undue influence was exerted. The claims of plaintiff are contradictory. On the one hand she endeavors to show defendant prejudiced his mother against her, and yet shows that her mother always, even to the last, was affectionate

to her, and that she rendered her mother the most loving services in her last illness.   Excluding the mass of incompetent and irrelevant testimony of quarrels between plaintiff and defendant when children; the wholly incompetent statements of defendant uttered twenty years before the will was executed; the declarations of Mrs. Catron that she held her property in trust for the benefit of her children; the controversies between plaintiff and defendant, long after the execution of the will and without the knowledge of their mother; the incompetent opinions of Lock Terhune, Elijah Neer and others; the fact that defendant in the last days of his mother's illness, at her request, carried her keys to her bureau drawers; the bartering for the cemetery lot; evidence that plaintiff had never been unkind to her brother; the evidence as to defendant administering the medicines to his mother in her last illness, all irrelevant and inadmissible on this issue, we have the simple fact that a perfectly sane mother has discriminated against her daughter and given her son the great bulk of her estate, which was reasonably worth $50,000, and bequeathing to her daughter only the usufruct of $5,000 during her life, remainder to her children.   It is urged that this is an unjust and unreasonable will.   To most minds it does appear to be so, and doubtless few jurors could be found who would not so say by their verdicts.   But the law which governs both courts and jurors, secures to every citizen of sound mind and lawful age the privilege of making a will.   The essential purpose of the Statute of Wills is that the testator may make discriminations.   If equality of distribution had been the policy of the lawmakers, they should have stopped with the Statute of Descents and Distributions, which provided equality. Having the right to discriminate, a testator may act

unreasonably.   He may be governed by his likes and dislikes, and still his will must be supported.

When this case was here on the former appeal it was said: "The presumption is in favor of the validity of the will, and it can not be that the mere fact of unjust discrimination in its provisions, *without more*, shifts the burden on defendant."   Inequality alone raises no presumption of undue influence.   *Farmer v. Farmer*, 129 Mo. 530;   *McFadin v. Catron*, 120 Mo. 252;   *Maddox v. Maddox*, 114 Mo. 35;   *Berberet v. Berberet*, 131 Mo. 399.   This being so, it was error to submit the issue of undue influence to the jury. *Eckert v. Flowry*, 43 Pa. St. 46;   *Jackson v. Hardin*, 83 Mo. 175.

We have hesitated long in holding that there was no substantial evidence upon which to submit this case to a jury, but it has been twice tried and on neither occasion was there elicited any evidence of a substantial character tending according to the well defined principles of law to prove that defendant had practiced any fraud, or had resorted to any undue influence, as these terms are construed by the courts, to coerce or extort from his mother the execution of this will in his favor at the time of or prior to its execution, and it is the imperative duty of the court to so declare.

It is not necessary that resort should be had to the evidence offered to show that Mrs. Catron was prejudiced against her daughter.   The evidence abundantly shows that Mrs. McFadin is a lady of ardent temperament, and that while it may be possible she may have said some unkind things in a moment of excitement, yet she seems to have been a dutiful daughter and cheerfully and lovingly rendered her mother the most loyal service at all times and especially in her illness. It is sufficient for us to rule upon this case that the competent and legal testimony in plaintiff's behalf fails

to show any want of testamentary capacity on the part of her mother to make a will, and is barren of any substantial evidence that Mrs. Catron's will was obtained by the exercise of undue influence by her son.

The judgment is reversed and the cause remanded with directions to the circuit court to enter judgment that the paper writing propounded as the last will and testament of Martha Catron be established as the last will and testament of said Martha Catron, and that defendant recover his costs laid out and expended.

BURGESS and SHERWOOD, JJ., concur.

ON MOTION IN BANC TO TRANSFER CAUSE TO THE COURT IN BANC.—MEMORANDUM.

PER CURIAM (BARCLAY, C. J., and GANTT, MACFAR-LANE, SHERWOOD, BURGESS and BRACE, JJ.)—Plaintiffs have filed a motion in the court *in banc* for a transfer of the cause thereto from the second division upon the alleged grounds that the decision of that division infringes upon plaintiff's constitutional right to a trial by jury, is not "due process of law," etc.

It was held by the majority of the court in banc in *State v. Duestrow* (1897) 137 Mo. 44 (39 S. W. Rep. 266) that "motions filed subsequent to a judgment in a cause are matters pertaining thereto, and must be filed in the division which rendered the judgment." The plaintiffs make no claim that this case falls within any of the classes named in section 4 of the constitutional amendment of 1890, or that the decision of the second division is in conflict with any ruling of the first division or of the court *in banc*, nor is any suggestion made beyond the claim that there is error in the opinion of the division in respect of certain rights claimed by plaintiffs, and on which the second division

Paving Co. v. Hezel.

adjudged adversely to plaintiffs. The pending application for a transfer to the court *in banc* is denied, in which ruling all present concur.

