# GEORGIA A. WOOD v. CARPENTER et al., Appellants.

## Division One, January 13, 1902.

1. **Will:** UNDUE INFLUENCE: KIND TREATMENT, ETC. Referring to his wife, prior to the making of his will, matters pertaining to the purchase of cattle, to the insurance of his residence, and to the payment of his share of the cost of sweeping a street, is no evidence that the will was the result of undue influence exercised by her over the testator. Nor is the fact that she "treated him kindly, but whatever she said for him to do he did without refusing." Nor is the fact that, after the will was made, he heeded her advice or direction about going to bed at the time she thought proper, or coming to his meals as she suggested, or going in the sun. Nor is the fact that, four years after he had executed the will in contest, he stated to a lawyer that he wanted him to write a will, and she said, "You already have a will." Nor that, five years before the will was made, he promised to give plaintiff all over $80,000 he sold certain land for and when it was sold for $85,000, of which only $20,000 was cash, over the protest of his wife, he paid the entire commission out of the cash he received.

2. ———: EXECUTION: SIGNED BY ANOTHER: ADMISSIBILITY OF EVIDENCE: PLEADINGS. In a contest to set a will aside, it is not competent to admit in evidence an admission of one of the legatees that he signed testator's name thereto, unless there is something in the pleadings justifying the issue of no will.

3. ———: INCAPACITY: EVIDENCE: ADMISSION OF LEGATEES. The admissions of one legatee concerning the testator's incapacity to make a will, can not bind other legatees and hence are inadmissible.

4. ———: ———: ———: ———: CONSPIRACY. Before such admissions are admissible as showing that the will was the result of a conspiracy among the legatees to derive special benefits for themselves, it must be shown that all the legatees participated in the conspiracy, those taking a life interest, as well as the remaindermen.

5. ———: CONTEST: SEPARATE JUDGMENTS. Separate judgments can not be entered against each legatee in a will contest. It must be set aside as to all or none.

Vol 166 mo—30

Wood v. Carpenter.

6. ———: EXPRESSED EQUALITY: PECUNIARY CONDITION OF LEGATEES. Where the testator in his will says that the amount he gives a contestant, added to the sum already advanced, makes her share equal to that of his other children, the jury have no right to consider whether or not he was mistaken about the matter, and, hence, the court should not instruct them that they may take into consideration the financial condition in life of the heirs.

7. ———: INCAPACITY: DISEASES. Dysentery at any time prior to making the will, or rheumatism, or bladder or kidney trouble, or enlargement of the prostate gland, or cholera morbus, is not, separately or in combination, evidence that testator was incapacitated to make a will.

8. ———: ———: EPILEPSY. Fainting spells or fits or epilepsy, however frequent during the years subsequent to the execution of the will, if they did not begin for some months thereafter, are no evidence of testator's incapacity.

9. ———: ———: OPINION OF WITNESSES. Opinions of witnesses that testator, for ten years before his death and six years before he executed the will, was incompetent to transact business, are valueless and do not constitute substantial evidence of such fact if such witnesses had no business, no conversation with him, heard no one else talk business with him, neither knew nor ever heard of his doing or saying a foolish or improper thing, or that he ever lost a cent in any business transaction.

10. ———: ———: THE WILL ITSELF AS EVIDENCE. Where the will itself is convincing that he who dictated it was capable of making a will, and the scrivener wrote it in the exact language dictated by the testator, who was a carpenter and not a lawyer, the opinion of others that he was incapacitated affords no basis for setting that will aside.

Appeal from Jackson Circuit Court.—*Hon. Edw. P. Gates,* Judge.

REVERSED AND REMANDED *(with directions).*

*John A. Sea* and *R. T. Railey* for appellants.

(1) The trial court, over defendants' objections, permitted plaintiff to introduce in evidence the acts, declarations and statements of one legatee against the others, upon the

theory that they were competent against the persons who made them. The court permitted alleged statements and declarations of one legatee to stand as evidence against the others. A will can not be set aside as to one, and sustained as to another. Under our law, as it now stands, all legatees are competent witnesses. The declarations, therefore, made out of court, by one legatee, are not admissible against either of the other legatees or himself, for the obvious reason that the will must stand or 'fall as a whole. Schierbaum v. Schemme, 157 Mo. 17; Gordon v. Burris, 141 Mo. 611; Abbott's Trial Evidence, sec. 128, p. 159; Freeman on Co-Tenancy and Partition (2 Ed.), sec. 169; Corning v. T. I. & N. F., 39 Barb. 325; Renaud v. Pageot, 61 N. W. 4; In Matter of Will of Mary Ames, 51 Iowa 600; Parsons v. Parsons, 66 Iowa 759. (2) A family quarrel could not possibly have had any effect upon said will written four years prior thereto. Yet the court, over defendants' objections, permitted plaintiff's counsel to try Mrs. Carpenter and Oscar, for not having invited plaintiff to her own father's funeral in 1898. (3) The deposition of Mrs. Carpenter had been taken in a collateral proceeding, instigated by plaintiff's husband. In this deposition, confidential communications between Mrs. Carpenter and testator were inquired into. Their past lives were examined, and confidential communications between them brought before the court. The plaintiff in this action having therefore introduced and read in evidence the foregoing deposition of Mrs. Carpenter, was estopped from objecting to a letter written by plaintiff for Mrs. Carpenter to testator, in regard to his business, upon the ground that the matters referred to therein were confidential communications. Tomlinson v. Ellison, 104 Mo. 113; Ess v. Griffith, 139 Mo. 328; In re Estate of Soulard, 141 Mo. 655; Borgess Inv. Co. v. Vette, 142 Mo. 569. (4) There is no charge in petition to the effect that the will in controversy was not formally executed by testator. Under the pleadings, therefore, it stood admitted that testator, in proper

form, executed the will in controversy, which was read in evidence without objection. Gordon v. Burris, 141 Mo. 616; s. c., 153 Mo. 232. The court below, therefore, committed error in permitting plaintiff, over defendant's objection, to attempt to prove by Dr. Wood that testator's name was not signed by him to the will in controversy. The petition having failed to charge, that the will in controversy was not formally executed, it stood admitted by the pleadings, that testator duly signed same. (5) "The term 'undue influence' has, in this State, a settled meaning. It means such influence, 'as amounts to overpersuasion, coercion, or force, destroying the free agency and will power of the testator. It must not be merely the influence of affection or attachment, nor the desire of gratifying the wishes of one beloved and trusted by the testator.'" Tibbe v. Kamp, 154 Mo. 579; Sehr v. Lindemann, 153 Mo. 289; Schierbaum v. Schemme, 157 Mo. 22; Defoe v. Defoe, 144 Mo. 464; Carl v. Gabel, 120 Mo. 296; Campbell v. Carlisle, 63 S. W. 704; McFadin v. Catron, 138 Mo. 218. (6) The issue is, whether or not testator had sufficient mental capacity when executing the will, to understand the business in which he was then engaged. The question for determination is: "Were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time when he executed his will?" McClintock v. Curd, 32 Mo. 419. This declaration of law has, in substance, met with the approval of this court, up to its very last utterance. Harvey v. Heirs of Sullens, 56 Mo. 372; Benoist v. Murrin, 58 Mo. 322; Brinkman v. Ruegglesick, 71 Mo. 555; Jackson v. Hardin, 83 Mo. 180; Myers v. Hauger, 98 Mo. 439; Thompson v. Ish, 99 Mo. 180; Norton v. Paxton, 110 Mo. 465; Couch v. Gentry, 113 Mo. 255; Maddox v. Maddox, 114 Mo. 42; McFadin v. Catron, 120 Mo. 268; Farmer v. Farmer, 129 Mo. 538; McFadin v. Catron, 138 Mo. 213; Cash v. Lust, 142 Mo. 638; Von De Veld v. Judy, 143 Mo. 348; Riley v. Sherwood, 144 Mo. 363;

Fulbright v. Perry Co., 145 Mo. 432; Schr v. Lindemann, 153 Mo. 288; Tibbe v. Kamp, 154 Mo. 584; Schierbaum v. Schemme, 157 Mo. 7; Riggin v. Bd. of Trs., 61 S. W. 804. Let it be conceded that testator, when will was executed, exceeded eighty years of age; that he was old, infirm, feeble, sickly, walked with a cane, did not, at times, remember names or faces of his acquaintances; that he talked about things of the past; that when persons came to transact business with him, he turned them over to his wife, without participating in said business; that he forgot about having taken his eighty acres of land back; that he had epilepsy in 1894 and 1896, after the will was written; that he wanted Flournoy to write another will, when he already had one; and possibly some other things of a similar character.   All these things may have been true, and still testator may have been perfectly competent to understand the business in which he was engaged in March, 1893, when will was written.   On the other hand, there is not a syllable of testimony tending to show that testator ever lost a dollar by any transaction, nor is there a word of evidence tending to show that he ever attempted to attend to any business that he did not successfully carry out.   For ten years he drew checks on Dr. Woods' Bank, for more than $6,000, payable to various parties, and which were paid without the slightest hesitation.   He deeded this plaintiff the sixteen acres of land in 1885, and no question was made as to his capacity to do business then.   Judge Parker says he wrote the will as testator dictated it, and read it over to him before it was signed. He directed Parker to take the will and keep it until called for.   Parker says he had known testator for some time, that he was able to be up and went down to dinner that day; that testator talked rationally and there was nothing wrong with him mentally.   He says in his opinion testator understood the business in which he was engaged when the will was written. (7)   Declarations of the testator, made before and after the execution of the will, are admissible in evidence, in a suit

to contest its validity, when the condition of the testator's mind or the state of his affections are in issue, and when such statements are made about the time of the execution of the will.    Such declarations are then received as external manifestations of his mental condition, and of the state of his affections, and not as evidence of the truth of the facts he stated. Gibson v. Gibson, 24 Mo. 227; Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo. 170; Walton v. Kendrick, 122 Mo. 518.    (8)    The declarations of the testator, before or after making a will, are inadmissible on the issue of its execution. Schierbaum v. Schemme, 157 Mo. 12; Walton v. Kendrick, 122 Mo. 519; Gordon v. Burris, 141 Mo. 613; Doherty v. Gilmore, 136 Mo. 421; McFadin v. Catron, 120 Mo. 274; Rule v. Maupin, 84 Mo. 589; Gibson v. Gibson, 24 Mo. 227.    (9) Where want of mental capacity and undue influence are charged in the petition, evidence of former wills and their provisions, are competent.    Thomas v. Stump, 62 Mo. 278; Muller v. St. L. H. A., 73 Mo. 243; s. c., 5 Mo. App. 390; Thompson v. Ish, 99 Mo. 165.    (10)    The fact that testator's mental capacity to transact business was never called in question, is the best evidence that he was capable of doing so. 3 Am. and Eng. Ency. of Law, p. 115; State v. Nelson, 58 Iowa 211; State v. Lee, 22 Minn. 408; Regina v. Rowton, 2 Bennett & Heard Cr. Cas. 333; Gandolfo v. State, 11 Ohio St. 114; Lenox v. Fuller, 39 Mich. 272; People v. Davis, 21 Wend. 309.    (11)    It is not necessary that a testator shall recall all his property, nor to recall all he had done for each of the persons coming within the range of his bounty.    Couch v. Gentry, 113 Mo. 255.    (12)    The opinion of a non-professional witness, as to a person's mental condition, should only be given in connection with a recital of the facts upon which he bases his conclusion.    Sharp v. Railroad, 114 Mo. 100; Appleby v. Brock, 76 Mo. 318; Moore v. Moore, 67 Mo. 195; Greenwell v. Crow, 73 Mo. 640.    (13)    Even if some provisions of the will are void, or meaningless, yet it must stand.

Owens v. Sinclair, 110 Mo. 57; Lilly v. Tobbein, 103 Mo. 487; Cox v. Cox, 101 Mo. 172.

*William H. Wallace, J. D. Shewalter, I. N. Watson* for respondent.

(1) The declarations and statements of one legatee under a will are admissible in evidence against the person making them. Armstrong v. Farrar, 8 Mo. 627; Jackson v. Hardin, 83 Mo. 186; Gordon v. Burns, 141 Mo. 602; Von de Veld v. Judy, 143 Mo. 368; Schierbaum v. Schemme, 157 Mo. 1. This latter case only holds such admissions are not admissible against the other devisees. The only material declarations offered in evidence were those of Lamira A. Carpenter, and these were offered as "against her alone" and were admitted against her and her alone. These declarations are admissible against the parties making them upon several grounds: First. Mrs. Carpenter was the principal devisee. In fact, with the exception of the one hundred dollars bequeathed to plaintiff, under the decision in Yocum v. Siler, 160 Mo. 281, she took the absolute title. The paper in controversy devises the property to the widow with power of sale, and the balance undisposed of at her death to the sons and the children of the deceased son. This created a fee in Mrs. Carpenter. Ruby v. Barnett, 12 Mo. 3; Macrum v. D'Oench, 17 Mo. 98; Gregory v. Cowgill, 19 Mo. 416; Hazel v. Hagen, 47 Mo. 277; Green v. Sutton, 50 Mo. 186; Reinden v. Kopplemann, 69 Mo. 482; Small v. Field, 102 Mo. 104. The declarations were of the owner of the fee under the will and were offered against her and her alone. Second. These admissions were offered and admitted against her and her alone. For such purpose, at least, they were clearly admissible under the well-established rule of declarations against interest. Armstrong v. Farrar, 8 Mo. 627; Allen v. Allen, 26 Mo. 327; Jackson v. Hardin, supra; Gordon v. Burris, 141 Mo. 602; Schier-

baum v. Schemme, 157 Mo. 1.    Third.    The evidence shows the conspiracy between Lamira and O. A. Carpenter; the conspiracy was not completed until the probate of the will and the distribution of the estate.    On settled legal principles the declarations of one conspirator, in the prosecution of the enterprise, is evidence against all.    It is certainly evidence against the conspirator himself, and that is all of our contention herein.    Fourth.    The deposition of a party taken in that or another cause, if pertinent, is always admissible against the party giving the deposition.    Kirtzer v. Smith, 21 Mo. 296; Pommeroy v. Benson, 77 Mo. 64; Bogie v. Noland, 96 Mo. 85; Priest v. Way, 87 Mo. 16.    There was, therefore, no error in admitting the deposition of Mrs. Carpenter "against her and her only," as was done by the court.    The record shows appellants insisted on plaintiff reading the whole deposition.    (2)    Upon the question of fraud and undue influence, it is entirely competent to show the action and conduct of the parties, devisees, both before, at the time and subsequent to the making of the paper, as bearing upon that question.    Mrs. Carpenter and O. A. Carpenter were charged with fraud, undue influence and a conspiracy in procuring the will. This they had read immediately after the death of the deceased; Mrs. Carpenter was present at its execution, knew its contents (although she declared she did not), and is clearly shown to have signed the paper; although she testified it was signed by her husband and not her.    Upon this question it was clearly competent to show the subsequent conduct, in not notifying the daughter of the death of her father and his funeral; especially as in this very paragraph appellant's counsel admit there was no trouble between the daughter and father, and as they further claim the trouble between the children had nothing to do with the matter.    Why, then, should she not be notified, except that the guilty conscience of the conspirators prevented?    (3)    Incompetency of a witness may be waived, and it has been held by this court where the

executor introduces the deposition of the plaintiff, the other party being dead, it is a waiver of the incompetency of the surviving party as a witness. This is the effect of the decisions cited by appellants. But the incompetency of a witness is quite a different matter from the incompetency of certain testimony. Thus, in this case, Mrs. Carpenter was a competent witness, but plaintiff could not waive the objection that, though competent as a witness, she could not testify to communications with her husband. The rule which excludes such communications is founded on public policy and can not be waived even by the husband and wife. If the deposition of Mrs. Carpenter contained incompetent matter, such as communications with her husband, then an objection should have been interposed to that particular portion of the deposition. (4) There was no error in allowing plaintiff to prove that testator's name was not signed to the paper in controversy. It not only tended to prove, but proved, fraud and undue influence. Defendants alleged in their answer that the will was signed by the testator in proper person. The petition alleged it purported to be signed by him. (5) Undue influence is such as coerces and controls the mind of the testator and forces him to execute the paper contrary to his wishes and desires if left free, and the burden of proving this issue rests upon those alleging it. In other words, it is the destruction of free agency. The court so declared the law for both parties. The only contention is that there was no evidence. There was ample evidence showing undue influence on Mr. Carpenter by O. A. Carpenter and Mrs. Lamira Carpenter, and in addition the evidence showed that O. A. Carpenter was acting as agent for his father in loaning money in Cass county, and so was Mrs. Carpenter transacting the business of Mr. Carpenter, and these facts created a fiduciary relation. Where a fiduciary relation exists, and the person bearing this relation receives the greater part of the estate, writes the paper or is present at its preparation and execution, the law presumes

undue influence and the burden is then cast upon such party to rebut this presumption. Whether they have done so is purely a question for the jury. Tibbe v. Kamp, 154 Mo. 580; Carl v. Gabel, 120 Mo. 283; Maddox v. Maddox, 114 Mo. 35. (6) The court properly declared the legal test as to mental capacity. The deceased was old, infirm, and afflicted with epilepsy, and had been for years; his old neighbors and acquaintances, who are much better judges than this court can possibly be, even if it had the constitutional power to determine that question, state that for years he was incapable of understanding or transacting the simplest business. The evidence shows that he did not do so. Dr. Jackson, his family physician, said he was almost a wreck mentally and physically; he was childish, and at that time (1892) was incompetent to take care of himself any way, physically or mentally. Epilepsy would render him incompetent to do business. He failed to recognize his most intimate acquaintance, and this was not from defective vision. As described by one witness he was a child again; he sat around, ceased to converse and took no part in business. He either forgot that he had made a will and wanted another, or, if he recollected that fact, was prevented by his wife from doing so. If the court should usurp the function of determining a question of this character the constitutional right of a jury trial is not worth the paper upon which it is written, and the long struggle of the English people to secure this guaranty has been destroyed. In some recent cases the courts have undertaken to pass upon the question as to whether there is any "substantial evidence." This, we submit, is not within the province or power of the court; if there is any evidence, whether it is "substantial" is solely for the jury. Gordon v. Burris, 141 Mo. 614.

MARSHALL, J.—This is a suit to contest the will of James C. Carpenter. The plaintiff is the daughter of the

testator, and the defendants are her mother (the widow of the deceased), and her brothers Oscar A. and James A. Carpenter, and the children of said James A., and the children of her deceased brother, Luther A. Carpenter.

The testator was born in 1812. The will was made on March 3, 1893, when the testator was eighty-one years of age. He died on May 15, 1898.

The will is as follows:

"I, James C. Carpenter of Cass county, State of Missouri, being of sound mind and memory, do make and publish this my last will and testament in manner and form following, that is to say:

"1st. It is my will that my funeral shall be conducted without ostentation, and that the expense thereof, together with all my just debts, be fully paid.

"2nd. I give, devise and bequeath to my beloved wife, Lamira A. Carpenter, all my real and personal effects, also all the household furniture and other items not particularly named and otherwise disposed of in my will, to dispose of any of the real or personal effects when in her judgment it is best, and that at the death of my said wife, all the property hereby devised or bequeathed to her as aforesaid, or so much thereof as may then remain unexpended, I give unto my son, O. A. Carpenter, at the death of my wife one thousand dollars less than one-third of all my real and personal effects, the said property to be divided at her death between O. A. Carpenter, Luther A. Carpenter and James A. Carpenter and his children (namely) Grover Cleveland Carpenter, Fanny Hill Carpenter and James C. Carpenter, also I give to my daughter, Georgia A. Wood, in addition to what I have already given her, the sum of one hundred dollars, this amount making her equal with the balance of my children.

"And last: I hereby constitute and appoint my said wife, Lamira A. Carpenter, and my son, O. A. Carpenter, to

be the executrix and executor of this my last will without requiring bond, revoking and annulling all former wills by me made, and ratifying and confirming this, and no other to be my last will and testament.

"In witness whereof I have hereunto set my hand this third day of March, 1893.

"Witnesses:

| | |
|---|---|
| "J. C. CARPENTER. | (Seal.) |
| "A. G. ENDICOTT. | (Seal.) |
| "J. L. HARRISON. | (Seal.) |
| "J. G. LYON. | (Seal.)" |

The grounds set out in the petition for contesting the will are:

"Plaintiffs say that said paper writing is *not in fact and in truth the last will and testament of the said James C. Carpenter; that the said James C. Carpenter was not,* at the date of the alleged execution of the said paper, *of sound and disposing mind and memory,* but that he was feeble in mind and memory *and was incapable of executing a last will and testament.*

"That at the date of the alleged execution of the said paper he was old and infirm in both mind and body and was easily controlled and influenced, in his then said condition by others, and that the said paper was *in fact procured by the importunities, persuasions and undue influence exercised over his mind by the defendant, Lamira A. Carpenter, and his son, Oscar A. Carpenter, and that he was induced to execute the said paper contrary to his true* desire and wishes, and that the same does not in fact and in truth, express his true desires and wishes at the time, with reference to the disposition of his property by will."

The case was tried in Jackson county, and resulted in a verdict for the plaintiff setting aside the will. The defendants appealed.

Two grounds are alleged in the petition for setting aside the will, to-wit, first, undue influence of the widow, Lamira A. Carpenter and of the son Oscar A. Carpenter; and, second, the incompetency of the testator. These will be considered in the order stated and the evidence bearing upon each issue will be referred to separately in the decision of each ground of contest.

## I.

### Undue Influence.

There is not a word of evidence that Oscar had the slightest undue influence over the testator, much less that he exercised any influence of any kind over the testator in the making of the will. In fact this charge in the petition was abandoned in the lower court by the plaintiff and is not insisted upon here.

Upon the evidence contained in the record of six hundred and sixty-five printed pages, there is nothing to support the charge of any undue influence of Mrs. Carpenter. There is nothing in the record that rises to the dignity of evidence that can be said to give even color to the charge, much less that can afford a basis to support a verdict upon. The essence of the testimony bearing upon this charge is that when Mr. Goodman went to see the testator, about 1885, about buying some cattle, and when he again went to see him about 1890, about paying his proportion of the cost of sweeping the street in front of his house, and when Mr. Redman went to see him in the fall of 1892, about renewing the policy of insurance on his house, the testator referred them to his wife, and she transacted the business, and the testimony of the plaintiff to the following effect:

1. Mrs. Carpenter always "treated the testator kindly but whatever she said for him to do, he did it without refusing.

2. "Q. Just state what you saw when they were there at your place? A. Well, whenever she thought it was time for him to go to bed she said: 'J. C., you had better go up to bed now,' or if it was to eat his supper she would say, 'J. C., come and eat your supper,' or 'You would better not go out in the sun, you had better sit down on the porch,' and he would mind her and do whatever she told him to do." The testator and his wife stayed at the plaintiff's house during the summers of 1893, '94, '95, '96, and '97. The will was made in March, 1893. So that all this relates to matters occurring after the will was executed.

3. Shortly after her brother Luther died, which was in 1897, four years after the will was executed, the testator and his wife went to see Mr. W. S. Flournoy, an attorney, about some trouble they had with a tenant, and after. talking over the matter, the testator said he wanted Mr. Flournoy to write his will, and asked him how much he would charge for it, and that Mrs. Carpenter said, "You already have a will."

4. Mrs. Carpenter and testator had separate bank accounts and sometimes Mrs. Carpenter signed testator's name, with his consent, to checks, and they were paid. It also appeared that the plaintiff sometimes did the same thing, and that she also signed her mother's name to checks, or at least to one check for $4,740, in favor of plaintiff's husband, that were drawn on Mrs. Carpenter's bank account. On the other hand, it appeared from the testimony of the plaintiff's husband that in April, 1887, he sold an eighty-acre farm for the testator under a contract with testator that he should have, as commissions, all it sold for in excess of one thousand dollars an acre; that he sold it for $85,000, of which $20,000 was paid in cash, and the remainder evidenced by notes secured by a deed of trust on the land sold; that he (plaintiff's husband) wanted his $5,000 commissions paid out of the $20,000 cash; that Mrs. Carpenter objected, and that the testator overruled her and had it paid, that is the $4,740. The $20,000 had

been paid to the testator, he gave it to his wife, she turned it over to plaintiff's husband to deposit for her, which he did, and the plaintiff drew the check for $4,740 against this deposit in favor of her husband, and signed the mother's name, and the plaintiff's husband says he would never have gotten it if it had not been for the testator.   It also appeared from the plaintiff's testimony that in 1897, over four years after the will was executed, the testator and his wife had been spending the summer with the plaintiff (they spent part of their time with each of their children), and when he started to leave to visit his son, James, he cried and told plaintiff he did not want to leave: "A.   My father told me—my father said when they got in the buggy he said: 'I don't want to go, Georgia, over there; it is against my will to go,' he says, and I says, 'Pa, I wouldn't go then,' and he says, 'I have got to go because your mother says for me to go.'"   These matters all appeared from the testimony adduced by the plaintiff.   The testimony adduced by the defendants showed that the testator was a well-read man, had a strong will, was very affectionate to his wife and to all of his children, and that neither his wife nor any one else attempted to or did influence him in the making of the will in question.

It also appeared that the testator made two wills prior to this one, the first in 1886, and the second in 1888 (both of which were found after his death in his trunk with the will in contest), and that both of them gave his wife substantially the same that is given by the will in contest, and the will of 1886 gave Oscar one-fourth after his mother's death, and the will of 1888 gave him one-third, whereas the will in contest gave him $1,000 less than one-fourth, in order, as the evidence shows, to charge him with a balance of that amount that Oscar owed the testator on a note for $2,100, and that the will of 1886 gave the plaintiff one-fourth after her mother's death, "less $3,000 advanced to her by me during my lifetime

in money," and the will of 1888 gave plaintiff only $500 cash, without any explanation.

The will was executed in Cass county in March, 1893, when the testator was visiting his son Oscar. Neither the plaintiff nor any of her witnesses was there when the will was executed and they do not pretend to know what took place, nor to testify to any undue influence being exerted at that time. The only persons who were present when the will was prepared and executed were the testator, and A. G. Endicott, J. L. Harrison and J. G. Lyon, the attesting witnesses, and Judge J. T. Parker, who drew the will, and Mrs. Carpenter. Oscar Carpenter was in the house, and came into the room while it was being written, but stayed only a few moments and neither did nor said anything about the will. Judge Parker says that he wrote the caption and then the testator dictated the will and he wrote it word for word as the testator dictated it; that when he came to make provision for his son, James, the testator said: "I hardly know how to fix it, as Jim was disposed to squander his money and he wanted to fix it in such manner that Jim could not squander it—so that it would do his children some good. Then Mrs. Carpenter said that he was fond of gambling, or some words to that effect; that he had a mania for gambling, and that if he got anything he would likely squander it, or words to that effect. Q. Is that all that she said in regard to the making of that will? A. That is all that I remember of, yes, sir." The will gave one-third to James and his children.

Upon such evidence if the verdict in this case can stand, then no man can make a will in favor of his wife that will stand, unless it appeared that he did the unnatural thing of mistreating, misusing and ignoring his wife during his lifetime and then left her his property when he died.

Nearly all the testimony for the plaintiff relates to matters that transpired after the will was executed, most of them in 1897, which was four years thereafter. None of them

have even any tendency to prove that Mrs. Carpenter used undue influence over her husband to procure the will. In fact there appears no good reason why she should have done so, especially in view of the fact that the will of 1888 gave her fully as much as the will in contest. All the witnesses · agree that Mrs. Carpenter was an exemplary wife and mother, and that she was devoted and kind and faithful to the testator, and had helped him to make and save what he had. What could be more just or reasonable, then, than that he should leave her at least a life interest in his property, as all their children were grown and self-supporting? And what could be more unjust than to permit the verdict in this case to take away from her what her devotion deserved and what her husband gave her, upon evidence of this character. The evidence does not fill the measure of the rule as to undue influence that is now firmly settled by a long line of decisions. [McFadin v. Catron, 138 Mo. l. c. 218; Carl v. Gabel, 120 Mo. l. c. 296; Defoe v. Defoe, 144 Mo. l. c. 464; Sehr v. Lindemann, 153 Mo. l. c. 289; Tibbe v. Kamp, 154 Mo. l. c. 579; Schierbaum v. Schemme, 157 Mo. l. c. 22; Campbell v. Carlisle, 162 Mo. 634.]

The trial court erred in submitting this charge to the jury, and should have withdrawn it from their consideration.

## II.

**Incompetency.**

The second charge in the petition is that the testator was incompetent to make a will at the time he made the will in contest in March, 1893.

Summarized the reasons given by the various witnesses for the plaintiff for believing that he was incompetent are: (1) that in 1832, he had an attack of dysentery, which left him subject to bowel troubles; (2) that for years he had suffered more

or less with rheumatism; (3) that for years he had kidney trouble, and took Cuticura and patent medicines for it; (4) that on March 27, 1893, he suffered from retention of urine; (5) that at times he had irritation of the bladder; (6) that like many old men he had enlargement of the prostate gland; (7) that in July and September, 1893, after the execution of the will, he had fainting spells, as some of the witnesses call them, fits, as some called them, and epileptic fits, as the medical experts pronounced them from the description given by the witnesses, for no doctor saw him while one was upon him, which rendered him rigid and unconscious for fifteen or twenty minutes, and which then gradually passed off and left him limp and pale and weak. The plaintiff and her husband are the only witnesses who testified that he had ever had any such spells before the will was executed, and she said he had been subject to them ever since she was a mere child, which was twenty-six or twenty-eight years before the trial, and her husband said he had them ever since he married into the family; (8) that he did not talk much, especially to strangers; (9) that he did not recollect the names of his friends, and on one occasion asked who the hired man on the place was; (10) that some of the witnesses thought he was not competent to attend to any business for ten years before his death, although not one of them who expressed such an opinion had any business with him or heard him speaking of business matters, during that time, or could state a word, a conversation, an act or a deed that was spoken or done by him during that time upon which they based their opinion; (11) that in 1892 he had an attack of cholera morbus, which prostrated him and made him very weak while it lasted.

On the other hand it appeared: (1) from the testimony of the physician who attended him after 1892 until his death that he had no organic trouble, and that while he had enlargement of the prostate gland, it was only a natural consequence of old age and was not unusually severe for a man of his age

(he was 86 years old when he died), and that his mental condition was as good as any old person of his age, and that he was mentally able to transact any business transaction; (2) that he had been a sailor and a carpenter and during the last ten years of his life he made what was needed around the place in a carpenter's way, including same barrels for vinegar that his wife had made, and that he said if it was not for the rheumatism he could still do a day's work; (3) that he read a good deal and kept up with the times and discussed politics with his neighbors, and went to picnics and fish fries; (4) that he loaned money to his neighbors and friends; (5) that he kept accounts with two different banks, during the last ten years of his life, and drew out over six thousand dollars from one, and none of the bankers ever had any doubt of his ability to transact business; (6) that he dictated the will in controversy, and remembered that he had advanced Oscar $2,100, of which there was $1,000 still due him, and, hence, he made Oscar's share $1,000 less than one-third of his estate; (7) that he remembered that he had given his daughter, the plaintiff, sixteen acres of land in 1885, which she sold in 1886 for $5,900, and that there had been paid the plaintiff's husband $4,740 as commissions for the sale of his eighty acres of land in 1887, and that these sums, with the one hundred dollars left his daughter in the will, would equalize her share with the shares of his other children; (8) that he knew his son, James, was likely to squander his portion and so he provided in his will that his one-third of the estate should vest in him and his (James's) children; (9) that all the people who knew him and associated with him at the time the will was made, including every one who was present when it was executed, testify that he was perfectly capable of making a will, and that after it was made he went down stairs and they all dined together.

The will was made in March, 1893; at that time and for four years afterwards and until after the death of Luther, there was no trouble in the family. In fact the testator and his

wife spent the summers of 1893, '94, '95, '96, and '97, at the plaintiff's house. When the eighty acres were sold in 1887, the plaintiff's husband claimed $5,000 commissions, under his contract that he was to have all over $1,000 an acre it sold for and the purchase price was $85,000. Only $20,000, however, was paid in cash, and Mrs. Carpenter did not think, and properly so, that he was entitled to his whole commission out of the $20,000, but was only entitled to a proportionate part thereof. The testator, however, required it all to be paid. This incident was improperly permitted to play a most important part in the trial of the will contest. That, together with the fact that after 1897 the plaintiff and her mother did not speak and that when the testator died she was not invited to the funeral, were dwelt upon as important factors at the trial. These two matters last referred to occurred more than four years after the will was executed and for that reason could have no bearing upon the issues and were improperly admitted in evidence.

After the death of the testator, the plaintiff's husband sued for the board of Mr. and Mrs. Carpenter while they were visiting their daughter, the plaintiff. The administrator of the estate also brought suit against Mrs. Carpenter to recover the $20,000, the cash payment received from the sale of the eighty acre farm. In that case Mrs. Carpenter's deposition was taken, and upon the trial of this case the plaintiff, over the defendant's objection, was permitted to read that deposition as an admission of Mrs. Carpenter. It is not clear, from a careful reading of that deposition, what admission of Mrs. Carpenter is supposed to be contained in that deposition, but counsel now argue that Mrs. Carpenter practically admits that she signed the testator's name to the will, and, hence, there is no will at all, and plaintiff was permitted to introduce expert testimony that the signature to the will was written by Mrs. Carpenter. It is enough to say that the petition raised no such issue, and such testimony was therefore wholly inadmissible, and that no such contention is allowable.

Over the objection of the defendants, the plaintiff was also permitted, as an admission of Mrs. Carpenter, to show that she said she was afraid her husband was going to die and that she did not want him to die, as she did not have matters in the shape she desired; also that she said she took testator to Mr. Flournoy to have him make another will, but she could not make him understand; also that she said the plaintiff should not have anything from her father's estate; also that she said the testator was incapable of transacting business. All of these matters were inadmissible. [Schierbaum v. Schemme, 157 Mo. l. c. 12.] Mrs. Carpenter's admissions could not bind the other legatees under the will. They could not be admitted as against her and not as to them, for the simple reason that if they had the effect to set aside the will as to her it would set aside the will as to the other legatees, also. In this respect a will contest is unlike an ordinary suit where separate judgments may be entered as to each defendant, and the admission of one defendant can therefore be limited to himself without injuriously affecting the other defendants. Counsel, however, argue that it is charged that Oscar and Mrs. Carpenter conspired to procure the will, and that in conspiracy cases the admission of one conspirator binds the other. But there is an absolute failure of proof of any conspiracy in this case, or of any improper act or influence of Oscar. So that even if this was a conspiracy case the foundation for the admission—to-wit, the proof of a conspiracy—has not been laid. But counsel overlook the fact that James and his children and Luther's children are legatees under this will, and there is no allegation of conspiracy as to them, and, hence, there is no room for claiming that Mrs. Carpenter's admissions could affect them.

The testator said that the one hundred dollars devised to the plaintiff, added to the advancements made by him to her, would make her share equal to the share of the other children. He may have been mistaken in his calculations, but that is no ground for setting aside his will. It may be that the plaintiff's

financial condition as compared to that of the other legatees was such that she needed more help than they did, but that is no ground for substituting our judgment or allowing the jury to substitute their opinion for the will of the testator, and for this reason the fourth instruction given for the plaintiff that told the jury that they could consider the financial condition in life of the heirs, was erroneous. The testator had a right to give it all to any one, without regard to whether he needed it or not, or whether some one else needed it more than he did.

To revert, then, to the question of the competency of the testator, it is plain that the fact that the testator had dysentery in 1832, or that he had rheumatism, or that he had bladder or kidney trouble, or that he had enlargement of the prostate gland, or that in 1892 he had an attack of cholera morbus, is not separately or in combination, any evidence that in March, 1893, he was incompetent to make the will in question. The fact that he had fainting spells in July and September, 1893 (after the will was executed), or fits or epilepsy after the will was executed, however frequently during the six years he lived after he made the will, is likewise no evidence of incompetency at the time he made the will. And the evidence shows that those spells never rendered him unconscious longer than twenty minutes, and that while he was weak afterwards his reason again assumed sway. The plaintiff and her husband are the only witnesses who swear to any such spells before the will was executed. She says her father had had them ever since she was a small child—for over twenty-six years—and her husband says he had had them ever since he had been in the family. If this is true then it is passing strange how she could claim he was competent to make the deed to the sixteen acres to her, or the contract with her husband for the $5,000 commissions, and equally strange how her husband could think him competent to overrule his wife's objections and force her to pay him $4,740 out of the $20,000, or how he could think him competent to make a deed to the eighty acres of land. For

there is no evidence that he had any such spells between the time he transacted that business for the plaintiff and her husband and the time he made the will in contest that could have made him competent at the one time to transact business and incompetent at the other to make a will.   Aside from this there remains only the opinions of the plaintiff's witnesses that for ten years before his death the testator was incompetent to transact business.   Those opinions are utterly valueless and do not constitute any substantial evidence in the light of the admissions of those witnesses that they had no business, no conversation with him and heard no one else talk business to him, and that they neither knew nor ever heard of his doing or saying a foolish or improper thing, or that he ever lost a cent in any of his business transactions.   In addition to this such opinions become as nothing, in the light of the facts shown by the direct testimony of the persons who did business with and for him during those ten years that he kept a bank account, drew out thousands of dollars on his own checks, loaned money to others, and remembered how much he had advanced to his children.   But above all, such opinions become worthless in the light of the direct, positive and uncontradicted testimony of Judge Parker, that he wrote the will, in contest, in the exact language that the testator dictated.   No one who .reads that will could believe for a moment that one who dictated it was incapable of making a will—especially if he was a carpenter as the testator was and not a lawyer.   The will shows that the testator knew what he was doing, what property he had and who were the objects and subjects of his bounty.

In short the verdict of the jury is wholly without any substantial evidence to support it, and can only be accounted for on the assumption that the jury accepted and acted on the theory of one of the plaintiff's witnesses who said the testator was incompetent to make a will because no man over eighty years old was competent to make a will.

The trial court should have directed a verdict for the

defendants and the judgment will be reversed and the cause remanded with directions to enter a judgment establishing the will. All concur.