# SOUTHWORTH, by Guardian, Appellant, v. SOUTH-WORTH et al.

## Division One, March 18, 1903.

1. **Will:** PROBATION: NON-PROBATING CLAUSE: BLANK EXECUTOR. The fact that a will contains a clause declaring that it is not to be probated or put of record, and that the name of the executor is left blank, affords no reason for refusing probate to the instrument in the form in which it was when executed, even though the blank was afterwards filled and the non-probating clause erased.

2. ————:———:————: ILLEGAL. A clause in a will that it should not be probated or admitted to public record, is of no legal force and effect, and, hence, whether or not such clause was legally cancelled after the will was executed and witnessed, is of no importance.

3. ————:————: EXECUTOR BLANK: NO RE-PUBLICATION. Where a blank was left in the will for the executor's name at the time it was executed, a subsequent filling of the blank by writing in the name of the person whom the testator desires to act as executor, without re-publication, is illegal, and in such case the will should be admitted to probate as it was executed, with the name of the executor omitted.

4. ————: CAPACITY. By competency to make a will is meant intelligence sufficient to understand the act the testator is performing, the property he possesses, the disposition he is making of it, and the persons or objects he makes the beneficiaries of his bounty.

5. ————:————: EVIDENCE. Mere opinions of witnesses, unaccompanied by any testimony showing any particular act or fact evidencing incapacity, do not make out a case of incompetency when the testimony shows that the testator knew what he was doing and to whom he was giving his property.

6. ————:————: PRIMA FACIE CASE: SUBMISSION TO JURY. When the proponents, either by the attesting witnesses or by evidence *aliunde*, have satisfactorily established testator's testamentary capacity, and thus made out a *prima facie* case in favor of the will, if then any substantial evidence of incapacity or undue influence is offered, the case should be submitted to the jury; otherwise, it is the duty of the court to direct a verdict for the proponents. And in this case it is held that there was no substantial evidence of testator's incapacity.

7. ————:————: RECUSANT WITNESS. A subscribing witness to a will impeaching his own attestation is worthy of little belief.

Appeal from Mercer Circuit Court.—*Hon. Paris C. Stepp,* Judge.

MODIFIED AND AFFIRMED.

*Eldon C. Orton* and *Ira B. Hyde* for appellant.

(1) The court erred in refusing to instruct the jury, at the close of defendants' evidence, to find the will was not the last will of Mr. Southworth. First. The will was signed by Mr. Southworth and by the witnesses to the will in an unfinished state. It was not signed and attested as Mr. Southworth's will, but the paper introduced in evidence was the paper upon which part of Mr. Southworth's will was written, but conditions being such that it could not be completed, the scrivener had Mr. Southworth sign same and had the witnesses sign it with the understanding that it was not his completed will, and the same was not signed and attested as such. It was signed and attested as an instrument that when finished was to be his will. As the same was never signed and attested after it was completed the will was not executed in conformity to the statute and, therefore, not entitled to be probated. The will itself at the time it was signed showed it was not complete. It was never attested by the subscribing witnesses as his will. R. S. 1899, sec. 4604; Jarman on Wills (5 Am. Ed.), (note 6) 33; Walton v. Hendrick, 122 Mo. 504; Waller v. Waller, 1 Gratt. (Va.) 454, 42 Am. Dec. 564; Withinton v. Withinton, 7 Mo. 589; Grim v. Tittman, 113 Mo. 65; Swift v. Wiley, 1 B. Mon. (Ky.) 117. Second. The will as signed by the testator and subscribed by the witnesses contained the provision that it was not to be probated or become a public record; as the testator is presumed to know the law (conclusively) and that if the will could not be probated or become a public record it could not be enforced, the law must raise the presumption that it was not intended to be his will, just the same as a will regular and formal

on its face is held not to be a will for the reason that it was not written with the intention to be enforced but in levity. The provision, if carried out, must make the will a nullity. A subsequent erasure of the clause (if the will was a nullity) could not place in force the remainder, as that would be equivalent to making a valid will without the formalities of the statute being complied with. Red., Wills (4 Ed.), 171-173. (2) The court erred in directing the jury to find the instrument read in evidence to be the last will and testament of O. H. Southworth. Under the conflict of the evidence of the two subscribing witnesses to the will, introduced by defendants as proponents of the will, it was a question to be submitted to the jury. Schouler on Wills (1 Ed.), 340-343; Jarm., Wills (5 Am. Ed.), 87; Elliot v. Welby, 13 Mo. App. 19; Mays v. Mays, 114 Mo. 536. (a) In the introduction of the testimony of the proponents of the will and the establishment of the sanity of the testator, there was a conflict in the evidence of the subscribing witnesses to the will as to the testator's mental capacity to make a will. Under this conflict of the witnesses to the will alone, as to the mental condition of the testator, it was a question for the jury. Odenwaelder v. Schorr, 8 Mo. App. 458; Maddox v. Maddox, 114 Mo. 35; Harris v. Hays, 53 Mo. 90; Benoist v. Murrin, 58 Mo. 322; Norton v. Paxton, 110 Mo. 456; Fulbright v. Perry County, 145 Mo. 432; Garland v. Smith, 127 Mo. 567; Carl v. Gabel, 120 Mo. 294; Tingle v. Cowgill, 48 Mo. 291; Harvey v. Sullivan, 56 Mo. 372; Delafield v. Parish, 25 N. Y. 9; Mays v. Mays, 114 Mo. 536; Walton v. Hendrick, 122 Mo. 518; 2 Greenl. Ev. (8 Ed.), 691; 1 Jarm. on Wills (5 Am. Ed.), 97. (b) Independent of the conflict of the evidence of the subscribing witnesses under the evidence as a whole there was substantial evidence to go to the jury upon the question of mental capacity.

*Alley & Alley* and *Harber & Knight* for respondents.

(1)   If Mr. Southworth had sufficient understanding and intelligence to understand his ordinary business and to understand what disposition he was making of his property, then he had sufficient capacity to make a will.   Riggin v. College, 160 Mo. 570; Sehr v. Lindemann, 153 Mo. 276; Cash v. Lust, 142 Mo. 630; Harvey v. Sullens, 56 Mo. 372; Benoist v. Murrin, 58 Mo. 307; Norton v. Paxton, 110 Mo. 456; Crouch v. Gentry, 113 Mo. 248; Maddox v. Maddox, 114 Mo. 35.   At an early day in this State the most satisfactory test was declared to be, whether the mind and memory of the testator were sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the will.   McClintock v. Curd, 32 Mo. 411; Fulbright v. Perry Co., 145 Mo. 442.   (2)   It is alleged that at the time of signing said purported will said O. H. Southworth had not "determined or made up his mind as to whom he desired to have for his executor. . . .   Afterwards, to-wit, on the next day, in pursuance of said intention, said Kobbe's name was written in said instrument."   It is apparent from this allegation that plaintiffs fully appreciated Mr. Southworth was capable of determining upon his executor, and making a will.   It is equally clear that Mr. Southworth fully understood his relation to all persons coming within the range of his bounty and the disposition he was making of his property.   He had informed Mr. Odneal two weeks previous of his intention of making a will, of the disposition he desired to make of his property—explained to him that it was arranged prior to the death of the mother of the little girl; that the girl was, upon the death of her mother, to go to live with her uncle, James Hunter, in Nebraska, as she did; that the boy was to stay with him, as he did; that the boy was to have his property, and the uncle was to care for the little girl.

It is also shown that Mr. Southworth was very fond of the little boy; that he was generally with him; that at one time he sent him to New York to visit his grandmother, Mr. Southworth's mother, the defendant, Eliza J. Southworth. Under these circumstances it would have been error for the court to have submitted to the jury the question of Mr. Southworth's competency to make a will. Cash v. Lust, 142 Mo. 630; Von de Veld v. Judy, 143 Mo. 348; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Aylward v. Briggs, 145 Mo. 604; Sehr v. Lindemann, 153 Mo. 275; Wood v. Carpenter, 166 Mo. 465; Riggin v. College, supra; Riley v. Sherwood, 155 Mo. 37.

BRACE, P. J.—On October 14, 1899, Oscar H. Southworth, late of Mercer county, died possessed of an estate of the value of about twelve thousand dollars, consisting of real and personal property, situate in said county, leaving him surviving as his only heirs at law, two grandchildren, both children of a deceased son. The plaintiff Oie Southworth is one, and the defendant Henry J. Southworth is the other of these grandchildren. The other defendant, Eliza J. Southworth, is the mother of said deceased. Afterwards on October 23, 1899, there was presented to the probate court of said county for probate, an instrument of writing, in words and figures as follows, to-wit:

"In the name of God, amen. I, O. H. Southworth, of Mercer county, Missouri, being of lawful age and of sound mind do make and constitute this my last will and testament as follows, to-wit: First, I give and bequeath to Henry J. Southworth, my grandson, all my real estate on the following conditions: That the said grandson, Henry J., shall not come into full possession of said real estate until he arrives at the age of thirty years. The land mentioned is to be kept in grass and the proceeds of the same is to be used for the maintenance of my two grandchildren, Henry J. Southworth

and Oie Southworth, my granddaughter.    The said proceeds shall be distributed as follows:    Henry J. to receive three-fourths and Oie one-fourth of said income.    This division is to run until Henry J. arrives at the age of twenty-one years.    When Henry J. arrives at the age of twenty-one years he is to have the right to the personal use of said real estate if he so chooses.

"I further desire that my personal property at my demise be sold and the proceeds of the same be loaned and the interest of the same be used as follows: One-half thereof to go to my mother, Eliza J. Southworth, while living, the other half to the two named grandchildren equally until Henry J. arrives to the age of thirty years.    After the death of my mother all the interest to go to the two named grandchildren. When Henry J. arrives to the age of thirty years the remainder of the personal estate to be applied as the real estate.

"I further desire that this last will and testament shall not be probated or become of public record.

"I herein make, constitute and appoint F. M. Kobbe, Exr., who shall give and execute a good and sufficient bond to the State of Missouri to take and execute this my last will and testament according to the provisons herein made.

"I, the undersigned O. H. Southworth, do declare on this 5th day of October, 1899, that the foregoing instrument is my last will and testament in the presence of the witnesses here signed.

"O. H. SOUTHWORTH.

"Witnesses:

"W. H. Odneal.

"J. J. Gadberry.

"S. M. Gadberry."

And on the same day the said instrument was admitted to probate in part, as follows:

"CERTIFICATE OF PROBATE.

"State of Missouri, County of Mercer, ss.—In the Probate Court.

"I, Fred W. Coon, judge of the probate court of Mercer county, Missouri, having examined the foregoing instrument purporting to be the last will and testament of O. H. Southworth, deceased, and signed by O. H. Southworth, and having heard the testimony of W. H. Odneal, J. J. Gadberry and S. M. Gadberry, subscribing witnesses thereto in relation to the execution of the same, do declare and adjudge a part of said instrument to be the last will and testament of the said O. H. Southworth, deceased, late of Mercer county, Missouri, and the same except that part constituting and appointing an executor, is hereby admitted to probate.

"In testimony whereof I have hereunto set my hand and affixed the seal of said court at office in Princeton, this 23d day of October, 1899.

[SEAL]                              "FRED W. COON,
                                   "Judge of Probate."

Afterwards to the September term, 1900, of the circuit court of said county this suit was instituted, under the statute, to contest the validity of said instrument as the last will and testament of said deceased. The grounds of contest set out in the petition being in substance as follows:

1.   That the following clause in said instrument, to-wit, "I further declare that this my last will and testament shall not be probated or become of public record," was "scratched out" after it was signed and attested.

2.   That at the time the instrument was signed and attested, the place for the name of the executor was left blank, and the name of F. M. Kobbe was thereafter inserted in such blank space, without the same being re-executed.

3.   That said instrument was not signed and attested as required by law.

4.   That the testator was of unsound mind.

5.   That the instrument was procured to be executed by the undue influence of W. H. Odneal.

At the close of all the evidence the court instructed the jury to "find the instrument read in evidence to be the last will and testament of Oscar H. Southworth." The jury returned a verdict accordingly, and thereupon the court rendered judgment establishing said instrument as hereinbefore set out, except the clause as to non-probating the same as the last will and testament of the said Oscar H. Southworth, and the plaintiff appealed.

On the trial the defendant introduced the attesting witness Odneal, who was the scrivener of the instrument, as a witness, who testified to the execution of the instrument by the testator and its attestation in manner and form as required by the statute, and that he was of sound mind at the time it was executed, and another witness who testified that the testator was of sound mind at the time the instrument was executed, but who was not present at its execution, and thereupon offered the instrument in evidence.   To its introduction the plaintiff objected.    The objection was sustained and the defendants then introduced J. J. Gadberry another of the attesting witnesses who after testifying to the formal execution and attestation of the instrument, further testified as follows:

"Q.   Well, I will get you to state what was Mr. Southworth's mental condition at the time he signed the will, as you observed it?    A.   Well, I would not consider it very good from the action of the man.

"Q.   Well, what do you say as to whether he understood the contents of the will?    A.   Well, if he did I never seen anybody that acted like he did that did understand anything."

Thereupon the defendants again offered the instrument in evidence. To its introduction the plaintiff objected. The objection was overruled, and the instrument read in evidence, and thereupon the defendants rested, and the plaintiff introduced evidence in support of her contest. The first evidence introduced being the deposition of Susan M. Gadberry, wife of the said J. J. Gadberry, the other attesting witness to the instrument, who, after testifying to the formal execution and attestation thereof, as the other two attesting witnesses had done, testified further as follows:

"Q. State what was Mr. Southworth's mental condition at the time of signing said will? A. He acted to me like he was under the influence of strong medicine, or was so weak that he did not know what he was doing.

"Q. State whether or not, in your opinion, he understood the contents of said alleged will? A. I don't think he understood half there was in it."

After which the plaintiff introduced other evidence developing, in connection with the evidence of the foregoing witness, substantially the following facts of the case:

(1) At the time the will was executed the only persons who had any natural claim upon the bounty of the testator were his mother and his two grandchildren aforesaid, for each of whom he made provision in his will. Both the father and mother of these children had then been dead for several years. The father having died first, and the mother in the year 1885. In pursuance of an understanding between the testator and their mother, the boy, after her death, remained with his grandfather to be reared and provided for by him, and the girl for a like purpose was taken by her uncle, a Mr. Hunter, her mother's brother, who resided in the State of Nebraska.

The testator was an intelligent and educated farmer, who raised but little grain, kept his farm in

grass, and made a specialty of breeding and raising thoroughbred Shorthorn cattle, in which stock and in hogs he dealt principally. He lived on his farm, and his little grandson, in whom his affection was centered, had lived with him since the death of his mother. He was devoted to his business and always gave it his personal attention. In the summer or fall of 1899, he attended a meeting of the stock association at Kansas City, at which he took some premiums on his stock, and delivered an address, which was published. His farm was about four miles from the town of Harris, in Sullivan county, where Doctor Wingo resided and practiced. On August 30, 1899, he called on Dr. Wingo, complaining that he was feeling tired and unwell, and the doctor without diagnosing the case, prescribed for him, and requested him to call again in a few days, which he accordingly did, and the doctor *then* diagnosed his case as ''progressive anaemia.'' The particular day on which this diagnosis was made does not appear, but it was evidently in the first days of the month of September. Between that date and the fifth of October he visited the doctor at his office about twice a week, coming from his farm to the doctor's office for that purpose. The doctor testified that he ''seemed to be in rather good condition so far as his mind was concerned,'' but gradually growing worse at each succeeding visit. ''I could not see any decided change at any of the times that he was at my office, only for the worse, and that gradually. I don't know what the condition of his mind was during those times.'' During this period he continued on his feet, going about, attending to his business as he had always theretofore done. On one of his visits to Doctor Wingo the doctor informed him that he could do nothing for him, and on the 19th of September he spoke to Mr. Odneal about drawing his will, giving him a general idea of the disposition he intended to make of his property. About this time he was negotiating a sale of some of his cat-

tle to Mr. Purdy; the sale seems to have been consummated about the 23d of September. The number of cattle sold or the amount of the sale does not appear, but it seems to have been a transaction of considerable magnitude for a man of his means; was conducted by himself; and notes were taken by him for some of the purchase money.

On or about the 3d day of October, two of his neighbors who under an agreement with him had put up the hay on his place for a portion thereof, called at his house for the purpose of making a division thereof. He told them that he did not feel able to go out that morning, but thought they could make the division at the house. There were twenty stacks of different sizes, and in different places, but by means of a rough diagram drawn on the wall of the house, the division was satisfactorily made, although the proceeding by this means, under the agreement, was a somewhat difficult matter, requiring good memory, and a correct appreciation of quantities.

On Thursday the 5th day of October, Mr. Odneal came to Mr. Southworth for the purpose of drawing his will, found him sitting on the side of his bed, and in a few minutes thereafter Mr. and Mrs. Gadberry arrived, came into the room where they were, and after the usual salutations Mr. Gadberry asked Mr. Southworth what he wanted with him. Mr. Southworth asked him if he had brought that milk down, and upon his answering that he had, asked him to bring him some milk and some crackers; after eating which, he told Gadberry that he wanted him to take halters and go look after two horses that were supposed to be in one of the renters' corn, and bring them to the barn and tie them up there. Thereupon Gadberry departed on this mission. Mr. Odneal told Mr. Southworth that he had come to do that writing. Mrs. Gadberry went into an adjoining room, used as a kitchen, leaving the door between the two rooms half open, and

busied herself doing up the chores there, and Mr. Od-
neal commenced the preparation of the will. He wrote
it as directed by Mr. Southworth. He wrote it first
in pencil, and then copied it in ink. He would write as
far as directed and then ask Mr. Southworth "what
next." When they came to the clause appointing an
executor, Mr. Southworth said he had two men in mind
(Johnson and Kobbe) but hadn't made up his mind
which to appoint, and a space was left blank for the
name of the executor. While the will was being dic-
tated, Mr. Southworth seems to have been lying down
on the bed; while the will was being copied he turned
over with his face to the wall, and went into a doze.
About the time Odneal had finished copying the will
in ink, Mr. Gadberry returned. Odneal invited Mrs.
Gadberry into the room, aroused Mr. Southworth from
his doze, and asked him if those folks would do for
witnesses. Mr. Southworth nodded assent, and Mr.
Odneal then read the instrument to him as copied in
ink, in the presence of Mr. and Mrs. Gadberry, and
asked him if that would do. Mr. Southworth asked
him if he could change it if he got up, to which Mr.
Odneal replied that he could, and Mr. Southworth then
and there in the presence of all three of these witnesses,
signed the instrument by his own hand, sitting up in
bed for that purpose, with the will before him on an
atlas resting upon his knees, and Mr. Odneal and Mr.
and Mrs. Gadberry then and there in his presence, and
in the presence of each other signed the same as wit-
nesses. The next day (Friday, October the 6th) some
of the neighbors assembled at the house of Mr. South-
worth for the purpose of arbitrating a little lawsuit,
that had been instituted against him for damages
caused by the trespass of some of his stock. The ar-
bitration resulted in an award of a small amount of
damages against him, was satisfactory, and he paid the
amount by check signed by himself. In the meantime,
he had changed his mind about the non-probating clause

of his will, and had decided to have Mr. Kobbe, who had acted in his behalf in the arbitration, for executor of his will, and so informed Mr. Odneal who was present assisting in the arbitration, who thereupon, as requested by him, cancelled said clause by drawing an ink line longitudinally across all the words thereof and inserted the name of F. M. Kobbe as executor in the blank space in the will, calling the attention of the other arbitrator to the fact at the time. On the next day, Saturday, October 7th, he was visited by his friends, Mr. Henderson and wife, who found him feeble, and he told them that he had done up his business the day before, that it nearly worried him to death, and that was the reason he was so weak. On that day or the next (Sunday) he was removed to their home, where he remained, gradually growing weaker until he died on the following Saturday, October 14, 1899.

After his removal to Henderson's, he talked with Mr. Henderson and others about his stock, told one of his attendants that Mr. Kobbe was his executor, that he wanted to see him, and requested that he be sent for. Mr. Kobbe came, received his notes from him, and afterwards, probably the day before he died, he told Mrs. Henderson the amount of them, and on the day that he died told Doctor Wingo who had been attending him since his removal to Henderson's and with whom he had also talked about his stock, who he wanted to appraise his cattle, and how he wanted them appraised. He could then only speak in a whisper.

(2) The grounds of this contest, except one, may be briefly disposed of. There was no evidence whatever tending to prove that the instrument was procured by the undue influence of W. H. Odneal, or any other person; and it is beyond question, on the evidence, that the instrument was executed *animo testandi* in manner and form as required by the statute. The facts that it then contained the non-probating clause, and that the name of the executor was left blank, af-

forded no reason for refusing probate of the instrument *in the form that it was then executed.* [Cox v. Cox, 101 Mo. 168.] The effect of the cancellation, and the insertion of the name of the executor, the next day, in the instrument itself, will be considered later. The further fact that two of the three subscribing witnesses to the will, on the trial, refused to testify that he was of sound mind at the time the instrument was executed, was not of itself sufficient to warrant refusal of probate thereof, if his testamentary capacity was satisfactorily shown by the other attesting witness, and evidence *aliunde.* [Morton v. Heidorn, 135 Mo. 608; Mays v. Mays, 114 Mo. 536; Holmes v. Holloman, 12 Mo. 536; Odenwaelder v. Schorr, 8 Mo. App. 458.] His testamentary capacity having been thus shown prima facie on the trial, we are brought to the main question in the case. Was there any substantial evidence on the trial, that he did not possess such capacity, at the time the will was executed? The law of this branch of the case is aptly and tersely stated in Sehr v. Lindemann, 153 Mo. l. c. 288-9: "When a will is contested it devolves upon the proponents to prove the execution of the will, that the testator was of requisite age and that he was sane. [Harris v. Hays, 53 Mo. 90; Benoist v. Murrin, 58 Mo. 322; Norton v. Paxton, 110 Mo. 456]. This makes out a prima facie case, and it then devolves upon the contestants to establish incompetency or undue influence. By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it, and the persons or objects he makes the beneficiaries of his bounty. Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons he has known, idle questions, or requiring a repetition of information, will not be sufficient to establish incompetency, if he has sufficient intelligence remaining to fulfill the above definition. [Farmer v. Farmer, 129 Mo. 530; Berberet v. Berberet, 131 Mo. 399; McFadin y.

Catron, 120 Mo. 252; Ibid, 138 Mo. 197; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 354; Fulbright v. Perry Co., 145 Mo. 432].   Mere opinions of witnesses . . . unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' [Fulbright v. Perry Co., 145 Mo. 432; Aylward v. Briggs, Ibid 604; Riley v. Sherwood, 144 Mo. 1. c. 364; McFadin v. Catron, 138 Mo. 197; Von de Veld v. Judy, 143 Mo. 348.] . . . If there is any substantial evidence of incompetency or undue influence the case should be submitted to the jury; otherwise it is the duty of the court to direct a verdict for the proponents.   [Fulbright v. Perry Co., 145 Mo. 432; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Von de Veld v. Judy, 143 Mo. 348; Berberet v. Berberet, 131 Mo. 399; Cash v. Lust, 142 Mo. 630; Defoe v. Defoe, 144 Mo. 458.]''   To the same purport are the more recent cases of Riggin v. Westminster College, 160 Mo. 570, and Wood v. Carpenter, 166 Mo. 465.

It requires no very liberal application of these principles to the facts of this case to determine this issue.   Doctor Wingo testified that after the removal of the testator to Henderson's his mind was not good, and Mrs. Henderson testified that between that time and his death ''he was not at all times rational, sometimes he acted like he knew everything, and sometimes he did not.   He would lay there most of the time, and didn't seem to realize anything or care for anything, didn't talk a great deal after we brought him to our house, he would talk about his cattle, about their being watered, and speak to my husband and talk about his hogs,'' and there was some other evidence of like character, from all of which it might be said that there was evidence tending to prove that the testator's mental condition after his removal to Henderson's was not at all times

good. But there was no substantial evidence tending to prove that he was not fully competent to make a will at the time the instrument in question was executed, or at any other time prior to his removal to Henderson's, unless it can be found in the evidence hereinbefore set out of the two recusant witnesses. As to this evidence, little need be said. In a recent excellent work on Wills, it is said: "As matter of law, a person who as a subscribing witness goes upon the stand and upon his oath asserts to be false that which at the execution of the will he, by a most solemn act, asserted to be true, deserves to be discredited, and is worthy of but little belief." "Lord Mansfield was of the opinion that a subscribing witness impeaching his own act was deserving of the pillory. (Walton v. Shelley, 1 T. R. 300.)" [1 Underhill on Wills, section 213, and note.] And in this case, in which this evidence was inconsistent with and repugnant to every fact disclosed, whether of act done, or word spoken in the preparation and execution of this instrument or attendant thereupon, as testified to by themselves, and the other attesting witness, the court was fully warranted in treating it as wholly worthless. The court committed no error in directing a verdict for the proponents upon this issue.

(3) Some objections are made to the rulings of the court, in the exclusion of evidence. But as the case did not go to the jury, and this evidence is in the record, and in reaching our conclusions we have considered all the legitimate evidence in the record, these objections need not be noticed.

(4) The only error in the record is in the form of the judgment. The will should have been admitted to probate in solemn form as it was executed, without the name of F. M. Kobbe in the last clause thereof inserted therein the next day after the will was executed. Such an addition could not be legally made without republication. As to the non-probating clause, it is only necessary to say that as that clause was of no legal

force or effect whatever, and the will in contemplation of law would be just the same whether that clause was taken out or left in, the question whether that clause was legally cancelled or not, is one of no importance in this case. It may be said, however, that it has been in effect ruled in this State that a legal and material clause in a will may be so cancelled under our statute. [Varnon v. Varnon, 67 Mo. App. 534, citing Bigelow v. Gillett, 123 Mass. 102, and Schouler on Wills, 389, 397].

It follows from what has been said that the judgment of the circuit court should be modified by striking the name of F. M. Kobbe from the last clause of the will, and the judgment so modified should be affirmed, and it is so ordered. All concur.